[S. F. No. 12748. In Bank.—September 3, 1929.]

FRANK H. PROCTOR, Appellant, v. K. ARAKELIAN et al., Respondents.

J. W. Bingham and Ralph W. Arnot for Appellant.

Lindsay & Gearhart and McKee, Tasheira & Wahrhaftig for Respondents.

SEAWELL, J.—Plaintiff appeals from a judgment entered in defendants' favor in an action arising from a transaction wherein plaintiff exchanged valuable real property owned by him and situate in the business district of the city of Oakland, at the northwest corner of Clay and Sixteenth Streets, 50x75 feet, upon which was located a substantial five-story brick building, with basement, for 1,000 acres of unproductive, unimproved and unmarketable land, belonging to respondent K. Arakelian, and of the quality known as magnesia alkaline clay, situate in the county of Fresno, and United States Liberty bonds of the par value of $55,000. Said bonds were found by the trial judge to be of the actual market value, including accrued interest, of but $49,614.01. Plaintiff in turn executed in favor of defendant Rosa Arakelian, wife of K. Arakelian, his promissory note for the sum of $30,000, secured by a trust deed upon said Fresno County real property, in which deed respondents K. Arakelian and D. Arakelian, the son of

defendants K. and Rosa K. Arakelian, were named as trustees. The complaint alleged that plaintiff was damaged in the amount of $79,535.99 by certain false and fraudulent representations as to the quality, adaptability and value of the Fresno County lands made to him by said K. Arakelian acting for himself and on behalf of his wife, Rosa K. Arakelian, and that "by reason of said damages as aforesaid the sum of $79,535.99 of the purchase price of said Oakland property has not been paid and the whole thereof, to-wit, $79,535.99, is now unpaid, and that the plaintiff claims to have and has a vendor's lien upon said Oakland property for said sum of $79,535.99, and that the plaintiff is entitled to have said deed of trust and note cancelled and the amount thereof credited upon said sum of $79,535.99.''

The prayer of plaintiff was that by reason of the fraudulent representations which induced him to enter into the transaction with K. Arakelian the note and deed of trust executed by him to Rosa K. Arakelian be canceled and that said sum of $79,535.99 be deemed to be a valid and subsisting lien upon said Oakland property and that the usual decree of sale be made and that the proceeds thereof be applied in payment of the amount found to be due plaintiff and that defendants be barred and foreclosed of all right, claim or equity of redemption in said premises and that plaintiff have judgment against K. Arakelian and Rosa K. Arakelian for any deficiency that might remain after applying all of the proceeds of the sale to the satisfaction of said judgment. The trial court's refusal to grant appellant a trial by jury is also made an assignment of prejudicial error.

An expert chemist familiar with the district in which said Fresno County lands are situate caused borings to be made in various parts of said tract and analyzed the soil taken therefrom and pronounced it unfit for any purpose. Others well acquainted with said lands and the district in which they are situate testified that said lands were low and flat, subject to heavy overflows from adjacent sloughs and streams, and by reason of the impervious clay strata which lies at varying depths below the surface, overflow waters are held in vast quantities upon the surface until late in the summer season; that the soil is so strongly impregnated with alkali and magnesia as to make it im-

possible to grow any kind of fruit-trees or vegetables or cereals known to produce crops in that section of the state. The cost of reclamation and the elimination of superabundant hostile elements would be greatly in excess of the revenue which could be derived from it for any known farm or agricultural uses.

Upon the record before us there is absolutely no other conclusion deducible from the evidence but the one that said lands have but a nominal value. The owner, Mr. K. Arakelian, testified that in placing said real property in the hands of his agent, the Laymance Real Estate Company of Oakland, for exchange purposes he declined to place a value upon the same when requested to do so by Mr. William J. Laymance, a member of said company who personally conducted the transaction. At the trial neither K. Arakelian nor his son, D. Arakelian, aged twenty-eight years of age, and familiar with said lands, nor his wife, Rosa K. Arakelian, who claims to be the exchange owner of the Oakland real property, gave any evidence as to value. William J. Laymance was deceased at the time of trial. The claim made by K. Arakelian that he placed no value upon said lands to his agent is disputed by the appellant. The inherent improbability that K. Arakelian declined to value said property in the circumstances of the situation and the directions he is reported to have given to his agent, Laymance, on this subject pending negotiations, will be considered later.

The Oakland property at the time of the execution of said agreement to exchange property was leased to L. H. Spotts by lease dated November 1, 1919, for a term of five years. The rentals reserved for the ground floor and basement were, for the first six months, $500 per month; for the second six months, $550 per month; for the third six months, $600 per month; for the fourth six months, $650 per month; for the third year, $750 per month; for the fourth year, $850 per month; for the fifth year, $950 per month, subject to the owner's right of cancellation. The upper floors were on a straight monthly rental basis of $500 per month. Payment of rentals was secured by a cash interest-bearing bond in the sum of $2,000. Said real property was held subject to a mortgage of $100,000 in favor of the Oakland Bank of Savings.

Negotiations were first opened and a proposal of exchange was first made by K. Arakelian in writing on June 4, 1921. At that time said building was earning as rentals $1150 per month—$650 for the ground floor and basement and $500 per month for the other four stories. The rentals under the transferred lease dated November 1, 1919, were to be increased at the rate of $100 per month for the third, fourth and fifth years, respectively. The last year's rental, as provided in said lease, aggregated $17,400 gross per annum—$1450 per month—which was better than interest at eight and one-half per cent per annum computed on $200,000. ■ Rentals derived from real property are an aid in determining value. (*Bonnarjee* v. *Pike,* 43 Cal. App. 502 [185 Pac. 479]; *Sullivan* v. *Helbing,* 66 Cal. App. 478 [226 Pac. 803]; *Atlas Development Co.* v. *National Surety Co.,* 190 Cal. 329 [212 Pac. 196]; Applied Evidence, vol. 5, p. 4595; 10 Cal. Jur. 847.)

Appellant Proctor had operated in the purchase and sale of business property in the city of Oakland, but was never engaged in the occupation of real estate broker, and it was his rule not to invest in country properties. Mr. Laymance had been in his office many times in an effort to interest him in the purchase of real properties which he had listed for sale and had acted as his broker in the purchase of other properties. Appellant first learned of the Fresno County property early in the year 1921.

William J. Laymance was the active intermediary in putting the deal through. He first brought said Fresno County property to the attention of Mr. Proctor early in 1921 in what seemed to be a casual conversation, in which Laymance stated that he had a definite offer from Arakelian to exchange said Fresno property for the Mrs. A. A. Moore home, which was located on the opposite side of the street to appellant Proctor's residence in Piedmont. Laymance stated to Proctor that the Moore residence was appraised by its owners at $175,000; that in addition to the Fresno County tract, consisting of 1,000 acres, $75,000 was to be paid in cash or secured by a first mortgage on the Moore property. This deal fell through, as did several others in which the Fresno County property was the main factor in the proposition of exchange. Laymance assured Proctor in subsequent conversations in which he was endeavoring to

bring about a deal between him and Arakelian that K. Arakelian was a man of high standing in Fresno County, a successful agriculturist and director of banks, and was possessed of much property and means and desired to exchange a portion of his Fresno County property for east bay district real property, as he contemplated removing to the city of Oakland or one of its adjacent districts.

K. Arakelian was, in fact, a man of reputed wealth, being a director of the Fidelity Bank of the city of Fresno, and engaged in carrying on an extensive fruit and melon business in Fresno. As stated in his own words, he owned ranches located "all over the country," naming specifically Fresno, Madera and San Joaquin Counties.

That Laymance, prior to bringing the subject to Proctor's attention, had been actively co-operating with K. Arakelian in an effort to exchange said Fresno property for Oakland property, there is no room for doubt. As early as May, 1921, and upon several subsequent occasions, respondent K. Arakelian visited Oakland, and inspected, examined and informed himself as to the value of Proctor's Oakland property. Proctor was not familiar with Fresno County property and had not and did not see it until some time after the exchange of deeds had passed. Neither had met the other, nor did they have immediate personal contact during the entire transaction. The evidence as to the false and fraudulent representations alleged to have been made by K. Arakelian through his agent Laymance mainly appears in the testimony given by Proctor, which was afterward stricken from the record upon motion of the respondents. No evidence was accordingly given by any of the Arakelians in refutation of the main charges made against K. Arakelian and Rosa K. Arakelian by the complaint. The latter was not called to the witness chair for any purpose.

K. Arakelian, we doubt not, was eager to dispose of said Fresno County property for east bay property, and, knowing that Laymance was acquainted with and had had some business transactions with Proctor, he relied upon Laymance to deal personally with him and make replies, rather than to do so himself, to the many inquiries as to soil, productivity, location, improvements and adaptability to present and future uses that are invariably made by prospective

purchasers, none of which could have been frankly answered without blighting the prospects of a trade so far as the Fresno County lands were to be considered as a substantial part of the consideration.

On June 4, 1921, said K. Arakelian, without any personal conference with Proctor, caused to be prepared and placed in the latter's hands a proposed agreement for the exchange of said properties. The proposed agreement contained the provision that the Laymance Real Estate Company was authorized to act as Arakelian's agent in negotiating said exchange, and the further provision that the Laymance Real Estate Company might also act as the agent of Proctor, from whom it might also receive a commission. As a part of the consideration of said proposal Arakelian agreed to give to said Proctor ''Fifty-five thousand dollars worth of United States Government Liberty Bonds at par value, divided approximately in first, second, third, fourth and fifth issues,'' and also secure a loan of $25,000 for said Proctor on said Fresno property on or before August 1, 1921, to be secured by Proctor's note and a first lien deed of trust payable two years after date, with interest at the rate of seven per cent per annum, payable semi-annually. The assignment of the lease on the Oakland property was also a condition of the proposed agreement. The subsisting mortgage of $100,000 on said Oakland property, held by the Oakland Bank of Savings, was expressly recognized. Said agreement also made said Oakland property subject to a second lien deed of trust in the °sum of $25,000 to F. A. Marshall, bearing interest at the rate of six per cent per annum, due and payable on or before November 1, 1921, which said $25,000 loan said Arakelian assumed and agreed to pay. What purpose this last-mentic_ed provision was meant to serve is not clear, inasmuch as no such loan was ever made and no trust was created thereunder. It seems to have dropped out of the case and its purpose was not disclosed. Said proposed agreement in its final clause provided that ten days were allowed Proctor for ''seeing land and acceptance'' of said contract. Proctor, upon receipt of the above proposed agreement, offered to accept the same provided the following proposed modifications be made: first, that it be understood that the water rights of the Fresno lands had not

been conveyed and were still appurtenant to the said lands; second, that said Arakelian, in addition to the proposition therein made, pay to said Proctor the sum of $25,000 in cash at the time of the transfer of deeds. The above offer and counter-offer on the part of the parties thereto did not eventuate in the parties agreeing on all the terms as proposed by the respective parties. Negotiations were then resumed between Proctor and K. Arakelian through said Laymance in accordance with the proposition of K. Arakelian that the real estate firm of which Laymance was the active participant should conduct said negotiations, there being no direct communication as found by the court either by writing or otherwise on the subject between K. Arakelian and Proctor. Said agreement as originally proposed, or as sought to be modified, did not receive the signatures of said parties. Negotiations seemed to have terminated for a time. Laymance made several trips to Fresno County in promoting the trade and put forth his best efforts to put Proctor in a frame of mind favorable to the ownership of the Fresno County property. He telephoned several times to Proctor from Fresno and called on him upon numerous occasions in an effort to stimulate his interest in the Fresno property.

On July 21, 1921, Proctor signed a proposed agreement for exchange of properties, doubtless procured by the efforts of Laymance, which in all material respects corresponded with the first proposal except that it omits any reference to the Marshall loan matter. By this contract Proctor proposed to give Arakelian his note for $30,000 payable substantially at the time, in the manner and at the rate of interest provided in the first proposed written agreement. Parts of said contract not material to a decision of the case, such as an adjustment of taxes, insurance, furnishing of certificates of title, etc., are omitted. On July 26, 1921, Arakelian proposed the following modification of said last proposal, which was accepted by Proctor: "And it is understood that said Laymance R. E. Co. may also act as agent for the owner of the first piece of property herein described, from whom they may also receive a commission. It being understood that I, said Arakelian am not to pay any commission."

Deeds to the properties proposed to be exchanged and escrow papers were subsequently executed and deposited with escrow-holders and delivered in due course to the respective parties entitled to receive the same. The Oakland property was, upon the request of K. Arakelian, conveyed directly by Proctor to Rosa K. Arakelian, wife of K. Arakelian.

The learned trial judge found that it was true that William J. Laymance was the agent of K. Arakelian for the limited period of seven days beginning with the day he presented his proposed agreement of exchange, to wit, June 4th, and ending on June 11th, the day on which the court held that negotiations terminated. The court further found it to be true that said Arakelian by his proposed offer of exchange dated June 4, 1921, falsely represented that he could secure a loan of $25,000 upon the real property then belonging to him, and that he then and there knew that no disinterested money lender, whether an individual or corporation, would loan in excess of $5,000 on said real property. It found, on the other hand, that no other false representation was made *on said June 4, 1921,* or on any occasion *thereafter during any negotiations* for the exchange of said property by the said K. Arakelian either with the intent to induce Proctor to make said exchange of properties or that he did knowingly, wilfully and designedly or at all make any representation whatever to Proctor as to the value, character or condition or capabilities or loan value of said property then belonging to him. The concluding finding on the issue of agency was that the second written agreement was initiated by said Proctor and that from July 21, 1921, to July 26, 1921, the date of its acceptance by K. Arakelian, said Laymance acted as the agent of Proctor, and from the last-named day to the final consummation of the transaction Laymance acted as the agent of both of said parties.

The inference that Laymance was Arakelian's agent to dispose of his property by sale or exchange for other property prior to June 4, 1921, independent of Proctor's testimony to the effect that Laymance had over a period of several weeks attempted to induce him to exchange his Oakland property for said Fresno County real property, is materially aided by the evidence of both K. and D.

Arakelian and is the only reasonable and logical inference that may be deduced from a consideration of the transaction itself. D. Arakelian, the son of the elder Arakelian, admitted that he had talked over the Mrs. A. A. Moore deal with Laymance. This testimony was in corroboration of Proctor's reference to the negotiations by Laymance of a trade for the Moore property heretofore adverted to, which incident occurred some time prior to Proctor's knowledge of or connection with the Arakelian property exchange. Again, the elder Arakelian, upon examination to determine what interest, if any, his wife had in the property in suit, made it reasonably certain that Arakelian had authorized Laymance to negotiate an exchange of the Fresno lands at a time before Proctor was brought into the transaction. His evidence as to his conversation with his wife as to the terms of the proposed trade cannot be reconciled upon any other reasonable theory. The finding that Laymance was not the agent in the sale or exchange of the Fresno property for Oakland property prior to June 4, 1921, is contrary to the fact as disclosed by the record. ■ While the trial court held that Laymance was not the agent of Arakelian until June 4, 1921, and that he falsely and fraudulently represented the loan value of his property in his written offer, it further held that inasmuch as the offer was not accepted in the precise terms in which it was made and was not executed as presented, any representations affecting the value of said property, however fraudulently made with a view of inducing Proctor to enter into said proposed agreement, would not be competent evidence for the court's consideration in determining whether the final action of Proctor in entering into the exchange was influenced by said false and fraudulent representations made in an effort to induce him to consent to the terms of the first proposed agreement. We think this position untenable. The ultimate object of all of the negotiations looked to the exchange of the real properties in suit which was finally consummated.

Even though there were lulls in the negotiations at times, they were, nevertheless, resumed and finally terminated in the exchange of said properties, which was the ultimate object from the first sought to be accomplished. ■ Where a person resorts to false and fraudulent representa-

tions of a material fact to gain an undue advantage over another and thereby induces him to believe that said representations are true, in the absence of a showing that the said false representations were removed, it will be presumed that they operated upon the mind of the person whom it was intended should be deceived to his prejudice thereby.

In the instant case whatever false representations were intentionally made in the beginning of the negotiations, even though the propositions originally proposed failed, were proper matters to be considered by the court in determining whether the fraudulent representations unduly influenced the action of Proctor. He testified that he believed said false representations and would not have made the transfer if he had not believed the representations made by Arakelian and his agent Laymance were true. █ We, therefore, are of the view that any false representations made by Arakelian's agent prior to June 4, 1921, with a view of influencing Proctor to his prejudice, would be material evidence in the case.

Plaintiff testified upon the trial, and his testimony is uncontradicted, that in agreeing to the exchange he relied upon representations of Laymance to the effect that the Fresno County land was valued at $75,000 to $100,000, and could be readily sold for $60,000; that it would sustain a bank loan of $25,000, and had been very conservatively appraised as for bank loan purposes by an appraiser for the Bank of Italy, to whom Arakelian had introduced him, at $45,000. It was further represented, Proctor testified, that the property was unimproved land ready for immediate cultivation and development and was suitable for the raising of alfalfa, rice and various fruit-trees; that Arakelian had not improved it because of his many other holdings, and then wished to dispose of it because he was coming to the bay district to live; that the major portion of the tract was high land, but readily irrigable from the Fresno slough, which passed through the property, and that there was little, if any, alkali in the land; that it was salable as a whole or in subdivision. Laymance exhibited to plaintiff pictures of the land, which he stated had been taken by himself and one of the Arakelians, and explained said pictures as supporting his assertions with regard to the

land. D. Arakelian was present when said pictures were taken. They exhibited a likely landscape, but could not have afforded Proctor any information as to the character of the soil. It is claimed that they are misleading.

The unrestrained authority that was conferred upon Laymance by K. Arakelian as to the value that he might place upon the lands of which Arakelian was the owner and its capabilities is best illustrated by the testimony of Mr. Arakelian given in support of his claim that he refused to place a value upon it to Mr. Laymance, in whose hands he had placed it for sale or exchange: ''Q. [Directing his attention to the value of the Arakelian land.] Did you have any conversation with him [Laymance] about that matter? A. We had a conversation. Q. What? A. We had a conversation. Q. What was it? A. Well, he asked me what I valued the land at, and I told him I didn't value it at nothing, to go and see it for yourself, find out yourself. I didn't want to put any price on it. Q. You placed no value on it? A. No.''

Interrogated as to whether he had had any conversation with Laymance as to crops that had been produced on said lands, his answer was no. He admitted that Laymance inquired of him as to how much a bank would loan on said property, and his answer was, ''I told him I didn't know, to go and find out for yourself.'' It would seem most strange and fall far without the usual that a large land owner and a man of affairs offering a portion of his property for sale would refuse to place any value thereon or to give his agent, who is totally unacquainted with his real property, any information as to its capabilities to produce crops or its adaptability for farming or commercial purposes. It would seem that such replies as above shown to have been made to pertinent questions as to value would by inference at least encourage the agent to go to unwarranted lengths in his representations as to values and productiveness of soil.

The theory of the respondents and the court seemed to be that the misrepresentations testified to by Proctor were made before June 4, 1921, and prior to the establishment of agency. The fact that the first agreement offered by Arakelian expressly acknowledged Laymance as his agent is not evidence that he was not his agent prior to said

day. The fact and circumstances impel a contrary inference.

The following testimony of Mr. Arakelian supports what is above stated: "Q. When was the first conversation that you had with Rosa K. Arakelian regarding this deal with Mr. Proctor? A. I don't remember the date. Q. Was it previous to the time of the offer of June 4th? A. I don't remember as to that, probably was. . . . Q. Any conversation you had with your wife before this deal with Mr. Proctor? A. Well, I told her that there was a deal over here to trade the Oakland property for the thousand acres I had."

While the time is not as definitely fixed as it should have been and perhaps could have been fixed, we are of the view that reading the case in its entirety there are substantial grounds supporting appellant's contention to the effect that Laymance had the Arakelian real property listed for sale or exchange some weeks before June 4, 1921, and, this being so, the testimony bearing on representations made during this period of agency was admissible and should not have been stricken out.

The findings of the trial court would indicate an attempt to treat the negotiations which began with Proctor's offer of July 21st as independent of previous dealings. We regard this division as artificial, as the inquiry here is whether the intent to commit a fraud was in the mind of the person charged. This issue may be determined by plans previously laid, if any, and all acts leading to its consummation may be shown in evidence. It is true that following the suggestion made by Arakelian in his first offer of exchange Proctor in his subsequent offer provided that Laymance might act as the agent of Arakelian and said offer was accepted with a few modifications. But even if this be so, that would not wipe from the mind of Proctor the false impressions previously made by Laymance, nor would it extend a privilege to Laymance to repeat them or immune Arakelian from liability for the acts of Laymance if it be shown that he and Arakelian were acting in concert to defraud Proctor. An agent may become unfaithful to his trust, and where he does both the agent and a third party with whom a conspiracy has been formed to defraud another may be called to account

in damages. Such cases are made out by the facts and circumstances presented.

The great discrepancy of values was enough to put Arakelian on notice that the transaction was grossly unfair if it could be said that he did not have actual knowledge of the misrepresentations that were being made by Laymance. The large earning ability of the Proctor business building situate in the heart of the Oakland business district has already been noticed. Plaintiff produced apparently conservative real estate dealers who were familiar with land values in Oakland who placed the value as high as $200,000 or $201,000. The witnesses called by the defense valued said business building from $140,000 to $150,000. No finding was made as to either Arakelian's or Proctor's respective properties. If the lowest appraisement placed upon Proctor's real property by defendants' witnesses be taken as the basis of valuation, his loss in the transaction would exceed $20,000, and if the values fixed by Proctor's witnesses be the basis of valuation, his loss would approximate $80,000. Any conservative view of the situation that may be taken will show that Proctor's loss is startling, considered with reference to the transaction. This gross inequality between the value of the property Arakelian was to transfer in the trade and the value of the property he was to receive and which he had inspected was so great that it must have suggested to him that the offer would not have been made except for imposition upon plaintiff by Laymance, whom Arakelian knew had been actively engaged in promoting the exchange, and reliance upon the implication in Arakelian's offer of June 4th that the property was of a value to sustain a loan of $25,000. In such a case Arakelian was put upon inquiry and is charged with such notice of the imposition as he would have obtained had he made inquiry. The action is to be determined as if Arakelian had actual notice of the imposition.

Nor are we of the view that Proctor was precluded from recovery because he accepted as true the positive assertions of Laymance and Arakelian without instituting an independent investigation to determine the value of the Fresno County land. Proctor operated on a large scale in buying and selling city property on his own account

and in financing, but he had no personal knowledge of farm lands in Fresno County. Arakelian was represented to him to be and was in fact a bank director and successful agriculturist in Fresno County. He was the owner of large agricultural holdings in Fresno, Madera and San Joaquin Counties. Proctor testified that Laymance had acted as his agent in the purchase of property upon eight or ten occasions, including the purchase of the Oakland property herein involved, and that he had always. found him reliable and had confidence in his integrity. He further testified that the press of a large New York business deal he then had under way kept him from making the trip to Fresno County, and but for the representations of Laymance and Arakelian, upon whom he relied, he would have investigated its value and character. Under such ' circumstances Arakelian cannot avoid liability by asserting that Proctor need not have relied on the representations made. (*Dow* v. *Swain,* 125 Cal. 674 [58 Pac. 271]; *Harris* v. *Miller,* 196 Cal. 8 [235 Pac. 981]; *Faull* v. *Johnson,* 94 Cal. App. 230 [270 Pac. 993]; *French* v. *Freeman,* 191 Cal. 579 [217 Pac. 515]; *Teague* v. *Hall,* 171 Cal. 668 [154 Pac. 851].)

It is the claim of appellant that Arakelian knew, as found by the court, that no bank or disinterested individual would loan the sum of $25,000 on his said property and before he agreed to secure such a loan he made special investigation as to Proctor's financial standing and finding it to be sound made the loan, not with the expectation of realizing that amount from a sale of said property, but by compelling its payment by Proctor. The court's finding that no bank or disinterested individual would loan $25,000 on said property is supported by the evidence.

The evidence offered to show that the bonds which were passed in the deal were the separate property of the wife does not satisfactorily establish that claim. It does no more than show them to have been purchased by community property and held in the exclusive possession of the husband. His conduct both before and subsequent to the transaction tends to show that the bonds were held under his control and ownership as other common property was handled by him.

Respondents contend that the appellant was guilty of laches and the court found with them on that issue. The action, which was not one for rescission, but for an affirmance of the transaction and the foreclosure of a lien which arose in a transaction involving fraud, was brought within the statutory period provided by law. The appellant did not make written complaint at once, but did protest the transaction in writing in February, 1923, and attempted to bring about a settlement. The installments of interest paid by him, amounting to $3,150, were paid with a notation that he did not thereby waive any rights in the premises.

We are of the view that the appellant was not entitled to a jury trial as a matter of right. The complaint presents a plain case for the foreclosure of a vendor's lien. (Sec. 3046, Civ. Code.) The enforcement of such liens is a well-recognized function of courts of equity. (*Clark* v. *Brown*, 141 Cal. 93 [74 Pac. 548]; *Hibernia etc. Soc.* v. *London etc. Ins. Co.*, 138 Cal. 257 [71 Pac. 334].) It follows that a jury may not be demanded of right in actions to foreclose liens. (*Curnow* v. *Happy Valley Blue Gravel etc. Co.*, 68 Cal. 262 [9 Pac. 149]; *Walker* v. *Sedgwick*, 5 Cal. 192; *Downing* v. *Le Du*, 82 Cal. 471 [23 Pac. 202]; *Vance* v. *Gilbert*, 178 Cal. 574 [174 Pac. 42]; *Van Valkenburgh* v. *Oldham*, 12 Cal. App. 572 [108 Pac. 42]; *Case* v. *Copren Bros.*, 45 Cal. App. 159 [187 Pac. 772].) No distinction in the matter of a jury trial is to be made between a vendor's lien for the unpaid purchase price and other liens. Not only is the action for the foreclosure of a vendor's lien an equitable proceeding, but the right to the lien is a creature of equity, now recognized by statute. (Sec. 3046, Civ. Code; *Woolley* v. *Wickerd*, 97 Cal. 70 [31 Pac. 733]; *Selna* v. *Selna*, 125 Cal. 357 [73 Am. St. Rep. 47, 58 Pac. 16]; *Martin* v. *Becker*, 169 Cal. 301 [Ann. Cas. 1916D, 171, 146 Pac. 665]; *Royal Cons. Min. Co.* v. *Royal Cons. Mines*, 157 Cal. 737 [137 Am. St. Rep. 165, 110 Pac. 123].) Although an action for relief which can be afforded only by a court of equity may involve questions of fraud and deceit such as are cognizable in a court of law, plaintiff is not entitled to a jury trial on such issues when they arise in an equitable proceeding. (*Angus* v. *Craven*, 132 Cal. 691 [64 Pac. 1091].)

An action for the cancellation of a note or other instrument on the ground of fraud in its procurement is likewise equitable. (*Ballou* v. *Avery,* 175 Cal. 641 [166 Pac. 1003]; *Angus* v. *Craven,* 132 Cal. 691 [64 Pac. 1091]; *Rocha* v. *Rocha,* 197 Cal. 396 [240 Pac. 1010]; *Pomeroy* v. *Collins,* 198 Cal. 46 [243 Pac. 657]; *Montgomery* v. *Mc-Laury,* 143 Cal. 83 [76 Pac. 964].)

We see no reason or principle why a vendor under facts which are sufficient to establish fraud should not be entitled to a lien in a transaction involving the exchange of real property.

It is not our intention in our discussion of the case as presented to prejudice any defense that respondents may make in case a retrial is had. We have stated the case as presented by the record before us and have drawn the conclusion therefrom which we feel must inevitably follow.

Permission is granted the plaintiff to amend his complaint, if so advised, as to the nature of the relief he may seek.

Judgment reversed.

Curtis, J., Richards, J., Preston, J., Langdon, J., and Waste, C. J., concurred.

Rehearing denied.

All the Justices present concurred.