BUTLER BROTHERS DEVELOPMENT CO., Respondent, *v.* BUTLER, Appellant; BUTLER et al., Interveners.

(No. 8,076.)

(Submitted December 30, 1940. Decided January 4, 1941.)

[108 Pac. (2d) 1041.]

*Mr. E. F. Bunker, Mr. Charles E. Carlson* and *Mr. Charles E. Carlsen, Jr.,* of the Bar of Minneapolis, Minnesota, for Appellant, submitted an original and a reply brief; *Mr. Bunker* and *Mr. Carlson* argued the cause orally.

*Mr. W. S. Hartman* and *Mr. J. M. Stotesbury,* for Respondent, submitted an original and a reply brief; *Mr. Stotesbury* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiff brought this action to foreclose a trust deed given to secure a promissory note in the sum of $62,158.38 executed by defendant Julius W. Butler on October 16, 1934, and payable to the order of the bearer. The complaint is in the usual form. Defendant Julius W. Butler answered, admitting the execution of the note and trust deed, but alleging that as a part of the agreement there was executed at the same time a written agreement between him, his brother, Paul, and his father, F. O. Butler, who dominated and controlled plaintiff corporation, which by its terms imposed obligations upon F. O. Butler as the *alter ego* of plaintiff which have not been fulfilled and, hence, that the note and trust deed were given without consideration. The reply to the answer was in effect a general denial.

The court ordered F. O. Butler, Paul Butler and Butler Company, formerly the J. W. Butler Paper Company, to be brought in as parties, whom we shall hereafter call the interveners. They filed a reply to the answer of Julius Butler, which may be termed a general denial. Julius Butler then filed a cross-complaint against the interveners charging them with fraud and conspiracy to injure his credit and to deprive him of his property and asking for damages. To the cross-complaint inter-

veners filed an answer denying most of the material allegations. To this answer Julius Butler filed reply. Defendant Julius Butler demanded a jury trial. His demand was denied and the cause was tried to the court sitting without a jury.

The court found the issues in favor of plaintiff and interveners and against the defendant Julius Butler and entered judgment foreclosing the trust deed from which judgment he appealed. A fair résumé of the facts shown in evidence is portrayed by the court's findings, which were as follows:

That the intervener, Butler Company, a corporation, is the successor of the J. W. Butler Paper Company, which latter company and its business was organized and founded by the father of intervener, F. O. Butler, and from whom Julius inherited three and one-third per cent. of the stock of the J. W. Butler Paper Company, and upon its reorganization Julius became the owner of three and one-third per cent. of the preferred and twenty-four per cent. of the common stock of the Butler Company.

That the Butler Company, and its predecessor, was a family concern; its stock, except a very few qualifying shares, owned by F. O. Butler, his brother, Fred Butler, Julius and Paul, all four of whom were directors of the company, F. O. Butler being its president and Julius its secretary. That the plaintiff in this case is a corporation organized by F. O. Butler, who is its president and who owns over eighty per cent. of its stock.

After the death of J. W. Butler, the father of F. O. Butler, F. O. Butler devoted his entire time, energies and abilities to the business and affairs of the company, which business he ardently desired should pass on to his sons, Paul and Julius, as their grandfather wished and hoped, upon his retirement.

"In 1928, Julius and Paul, together with one Cunningham, became interested in the organization of what they called the 'Frontier Preserve,' which was a scheme for acquiring control of several hundred thousand acres of land in the mountains of Gallatin and Madison Counties, devoted to the preservation of wild life, where the game might be saved from the hunter, and affording pleasure and education to the citizens of the land.

And to carry out this scheme, Julius, Paul and Cunningham organized a corporation which they called the Rising Sun Ranches. The Frontier Preserve scheme was afterwards abandoned, but in the activities with reference to it, Julius incurred an indebtedness approximating one hundred thousand dollars, and the three stockholders in Rising Sun Ranches, who are also its directors, failed to file the annual report of corporations required by the statute and so became liable for the debts of the company, and Julius was in straitened financial circumstances. He borrowed twenty-five thousand dollars from the Northern Trust Company of Chicago, and pledged his stock in the Paper Company as security therefor. He sought a loan or loans in unnamed amount from his father, brother and the Paper Company, of which he was secretary and one of the directors, but was refused those loans. Finally, in June, 1931, he disposed of his stock in the Paper Company to Paul, under the terms of a writing of June 23, 1931," which is as follows:

"23, June, 1931.

"From: Mr. Paul Butler

"To: Mr. Julius W. Butler

"Subject: Paper Business Stocks

"This letter to you forms your exclusive option to repurchase from me the paper business stock which I have bought from you and fully paid for, providing following provisions and agreements are carried out:

"(a) I am to be fully cleared without further cost to me, to be evidenced by documents satisfactory to me, of any liability or indebtedness whatsoever to you personally, Mr. M. S. Cunningham or to the Rising Sun Ranches, including any creditors of the Rising Sun Ranches, or of yours, M. S. Cunningham's or mine, arising out of activities of the Rising Sun Ranches and kindred ranch activities thereto; also including any obligations of the aforementioned on purchase of land in connection with your ranch activities.

"(b) I and Mr. M. S. Cunningham are to endorse over to you our stock in the Rising Sun Ranches, and if you succeed eventually in making what you would consider a satisfactory

return from these activities, you will recognize my assistance rendered to a greater extent and before that of Mr. M. S. Cunningham by some form of cash payment or settlement with me, it being understood and agreed however that there is no compulsion on your part of thus recognizing either of us.

"(c) It is also agreed that you will save me from any future liability in connection with these ranch or land activities.

"(d) It is furthermore understood and agreed that if you exercise this option, you shall pay for the stock in cash, purchase price to be monies that I have paid you and which total as of this date $130,000.00, to which shall further be added any other payments that I may make to you from time to time, plus any interest charges, expenses or other obligations which may accrue to me as a result of the payments thus far made or advances I may make after this date or other liabilities and expenses which may be incurred by me in extending you financial assistance on your ranch activities, it being understood and agreed that should you exercise your option, it will be done having fully met the provisions of this agreement, and your repurchase under the above provisions will be for all but one share of the common stock, this one share remaining my property in consideration of my extending financial assistance, also to give me a larger holding and ownership in the business.

"(e) It is also understood and agreed that upon repurchase as above provided for, the repurchase should be made under a form of trust or other form of holding that I would deem to be to the best interest of the business, it also being understood and agreed that my block of stock would be placed in a relatively similar form with respect to our respective future personal estates.

"(f) It is also understood and agreed that I am in no wise to be held responsible for keeping intact the stock I purchase from you at its present book or face value or saving it from retirement or other disposition, such as might be decided upon by the control of the stockholders or of the directors.

"(g) This option expires December 1st, 1931.

"(h) If I secure extension of time on liabilities entailed, I will extend this option for a similar period of time.

"Paul Butler

"Julius W. Butler,"

"which writing appears upon its face to be an absolute sale of the stock to Paul for $145,000.00, but which Julius now claims was a loan. Paul paid for the stock $130,000.00 in cash, cancelled the indebtedness of Julius to him and procured the cancellation of an indebtedness of Julius to the Paper Company of fifteen thousand dollars, Julius receiving as a result of this transaction $145,000.00 Paul hypothecated the stock with the Paper Company to secure his note for that sum, $145,000.00, and for it obtained the $130,000.00 in cash paid Julius. Later Julius claimed that he should have received more money for the transaction, and these claims developed into wide differences of opinion between himself and Paul, in which F. O. Butler became involved. Julius was persistent in his claims and threatened litigation, charged both his brother and father with bad faith, but finally the parties got together and as alleged in the cross-complaint Julius 'did settle his demands, rights, claims and causes of action against F. O. Butler and Paul by the following contract at said times made and entered into between them, which said contract it was agreed and covenanted between the parties should and did constitute full accord and satisfaction of their then existing disputes, differences, demands, rights, claims and causes of action as follows.' After which appears the contract of October 16, 1934," which is as follows:

"This agreement made and entered into by and between F. O. Butler, hereinafter referred to as party of the first part, Paul Butler, hereinafter referred to as party of the second part, and Julius W. Butler, hereinafter referred to as party of the third part, namely:

"1. Julius W. Butler's (party of the third part) total outstanding obligations as per attached list approximate Forty Four Thousand ($44,000.00) Dollars, including interest, all of which indebtedness is to be taken up after the best manner found practical; details regarding which are to be handled by

H. W. Reiher, with full cooperation by Julius W. Butler, party of the third part, in an effort to effect compromise in settlements and extensions in time, etc.

"2. If consistent with financial conditions, in the opinion of both parties of the first and second part, but not otherwise, the Thirteen Thousand ($13,000.00) Dollar mortgage on the Holter Tract will be paid on or before maturity, which is January 1, 1938.

"3. In addition to No. 1 above, a maximum allowance of Twenty-One Thousand ($21,000.00) Dollars is to be paid Julius W. Butler, party of the third part, in convenient annual installments, over a period of five (5) years, amounting to from Four Thousand ($4,000.00) to Five Thousand ($5,000.00) Dollars per year.

"4. Julius W. Butler's (party of the third part) indebtedness to F. O. Butler (party of the first part) now amounting to approximately Sixty Thousand ($60,000.00) Dollars is to be refunded through the execution of a new mortgage or trust note to be secured by good and sufficient lien, and held in satisfactory form, for benefit of first and second parties hereto, on the two Montana Ranches owned by Julius W. Butler (party of the third part) and known as Nine Quarter Circle Ranch and Seven Up Ranch, and for the benefit of the party of the first part, on premises owned by the third party in York Township, DuPage County, Illinois, known as the Henry Jones Farm.

"5. F. O. Butler, party of the first part, and Paul Butler, party of the second part, agree to furnish funds required in the discharge of third party's obligations, and the providing of allowances as stated in paragraphs 1, 2 and 3 above; All disbursements and expenditures in relation thereto to be borne by said first and second parties, each sharing one-half, viz. 50%– 50% base.

"6. The above said Montana Ranches, either one or both, can be released on Julius W. Butler's (party of the third part) personal request subject only to the extent that the sum total of all monies paid out and to be paid out by the said first and second parties hereto, and expended in lifting third party's in-

debtedness and providing annual allowance, all as per paragraphs 1 and 2 and 3 as hereinabove, such sum total of monies so expended to be fully protected by first lien mortgages or judgment levies in favor of said first and second parties hereto and for their joint account.

"7. All details regarding the foregoing to be under the jurisdiction and direction of said H. W. Reiher who will act for and in the interest of all parties concerned.

"8. The desire of all parties hereto, and the purpose of this joint effort, and understanding, is to place Julius W. Butler in a permanently sound financial position, and it is agreed that if within a period of five (5) years from date hereof Julius shall have proved his ability to put the operating expense (exclusive of interest upon invested capital and depreciation) of his two Montana ranch properties upon at least break even base, and also to conduct his part of our joint affairs along reasonably safe lines as against further material encumbrances or complications, then and thereafter it will be regarded by all parties hereto that the purpose of our joint efforts has been successfully accomplished; said F. O. Butler and Paul Butler to be the sole judges, following which the said mortgages and judgment or other liens upon said Montana ranches held by the first and second parties hereto shall be released.

"Signed this 16th day of October A. D. 1934.

"F. O. BUTLER
"PAUL BUTLER
"JULIUS W. BUTLER

"Witness:

"H. W. REIHER."

"VI. At the date of the execution of the contract of October 16, 1934, Julius was indebted to F. O. Butler, as paragraph 4 of the contract recites, in the sum of approximately sixty thousand dollars, which was secured by a mortgage on land in Illinois, which the contract provided was to be refunded by a note and new mortgage covering the land in Gallatin and Madison counties, described in the complaint and trust deed herein, and

it was so renewed by the execution of the note and trust deed sued on and set out in plaintiff's complaint.

"VII. By the terms of said contract, under the provisions of paragraph 1 the interveners agreed to pay $44,000.00, the estimated amount of Julius' indebtedness and under the terms of paragraph 3 of the contract, and in addition to the provisions of paragraph 1, they agreed to pay twenty-one thousand dollars in annual installments of from four to five thousand dollars per year. At the commencement of the action, interveners had paid in full the forty-four thousand dollars and all but $1934.62 of the twenty-one thousand dollars and at the time of the trial they paid into court for Julius said sum of $1934.62, and have thereby fully discharged the obligations of paragraphs 1 and 3 of the contract.

"VIII. The interveners exercised the option granted by them paragraph 2 of the contract, which reads as follows:

" 'If consistent with financial conditions in the opinion of both parties of the first and second part, but not otherwise, the thirteen thousand ($13,000.00) dollar mortgage on the Holter tract will be paid on or before maturity, which is January 1, 1938.' and did not discharge the mortgage, and the same has been foreclosed and purchased by the Holter Company at foreclosure sale.

"IX. Under the provisions of paragraph VIII of the contract, Julius has not proved his ability to put the operating expenses (exclusive of interest, upon invested capital and depreciation) of his two Montana ranch properties, upon at least a break-even base. On the contrary, his operations have shown a loss every year since the execution of the contract. And since its execution, he has contracted debts which he cannot pay, of approximately $7,000.00 ta one Cutler; approximately $5,000.00 to Northern Automobile Company; approximately $4,678.32 to one H. B. McCay, besides federal income taxes.

"X. Although Julius has made a demand under the provisions of paragraph 6 of the contract for the release of the properties covered by the trust deed sued on in the complaint, he made no offer to protect the interveners by first lien mortgages

or judgment levies for moneys paid out under paragraph 1, $44,000.00 and paragraph 3, $21,000.00, of the contract.

"XI. The plaintiff is a corporation duly organized which furnished the funds, which made up the original indebtedness of approximately $60,000.00, which was refunded according to the terms of paragraph 4 of the contract, and is the owner and holder of the promissory note or bond secured by the trust deed, the principal of which is $62,158.38, and bears four per cent interest, no part of which principal or interest has been paid, and there remains due and owing to said plaintiff the said sum of $62,158.38, with interest at the rate of four per cent per annum from the 16th day of October, 1934.

"XII. Under the terms of the trust deed, if Julius failed to pay the taxes on the property or the interest, as provided to be paid annually, the party of the first part might declare the entire amount due, and foreclose accordingly. Julius paid no interest, as provided by the bond and trust deed and failed to pay the taxes upon the property in the sum of $3,204.12, which the plaintiff was obliged to and did pay in order to save the property from tax sale.

"XIII. Paul Butler and F. O. Butler did not at any time enter into a conspiracy to cheat, wrong or defraud Julius Butler of any of his property, and neither did Paul Butler or F. O. Butler jointly or severally, defraud Julius Butler of any of his property, or jointly or severally practice any fraud or deception upon Julius Butler.

"XIV. The contract of October 16, 1934 was entered into in good faith by F. O. Butler, Paul Butler and Julius Butler, and with the intention on the part of F. O. Butler and Paul Butler to perform the same, and Paul Butler and F. O. Butler did perform said contract.

"XV. The value of the 'Holter Tract' did not exceed the amount of the mortgaged indebtedness against it.

"XVI. By the terms of the trust deed and note, the plaintiff is entitled to recover from the defendant, Julius W. Butler, a reasonable attorneys fee for the services of its counsel in the foreclosure proceeding. The plaintiff was obliged to and did

employ counsel to bring and conduct the foreclosure proceedings, and a reasonable attorney fee for their services in his behalf is the sum of $2500.00.

"XVII. The note and mortgage described in the complaint herein, and the contract between F. O. Butler, Paul Butler and Julius Butler under date of October 16, 1934, were executed as one transaction, and the plaintiff company had notice of the existence and terms of the contract of October 16, 1934."

As conclusions of law, the court found:

"I. Under the terms of paragraph 8 of the contract of October 16, 1934, there was no obligation imposed upon Julius Butler to prove his ability to put the operating expense (exclusive of interest on invested capital and depreciation) of his two Montana ranches upon a break-even basis, and thereby secure the benefit of a release of the said ranches from the lien of the mortgage, the same being in the nature of a reward if he did so. In order for him to keep this privilege alive, it was necessary for him to perform the obligations of the note and mortgage until the conditions of said paragraph 8 had been fulfilled by him.

"II. The defendant Julius Butler, being in default in the performance of his obligations, imposed upon him by the note and mortgage sued upon, cannot claim the privileges intended for his benefit under paragraph 8 of the contract of October 16, 1934.

"III. The plaintiff is entitled to a decree of foreclosure for the full amount of principal, interest and attorneys fees, as set out in the above findings, together with its costs and charges in this behalf laid out and expended.

"IV. All of Julius' demands, rights, claims and causes of action against interveners F. O. Butler and Paul existing on October 16, 1934, were adjusted, settled and compromised, and that contract did constitute full accord and satisfaction of all then existing disputes, differences, demands, rights, claims and causes of action between the interveners and said Julius.

"V. The interveners acted fully within their rights under the contract, and paragraph 2 thereof, in not paying on or before maturity the Holter mortgage.

"VI. The interveners have complied with all of the conditions and requirements of the contract of October 16, 1934, and are entitled to decree and judgment accordingly.

"VII. Julius is not entitled to a release of the mortgage in suit or to a return free of liens of the property described in the trust deed, and the decree should so provide.

"VIII. The defendant Julius Butler is entitled to the sum of $1,934.62 paid into Court by F. O. Butler and Paul Butler as a complete performance of their obligations under the contract of October 16, 1934.

"IX. The defendant Julius Butler is not entitled to any damages or relief by virtue of his cross-complaint against the plaintiff and interveners herein."

The first point raised by appellant is that he was entitled to judgment on the pleadings and to a dismissal of the action at the close of plaintiff's case. Briefly he contends that the action was premature since under the agreement of October 16, 1934, he had five years within which to establish his ability to operate the property on a break-even basis which time had not expired when the action was commenced. The court's first and second conclusions of law are a complete answer to this contention.

The next contention is that it was error to deny to appellant the right to a jury trial. The Montana Constitution, Article III, section 23, guarantees a right to a trial by jury and this has been interpreted to apply to those cases only when the right of trial by jury existed at the time of the adoption of the Constitution. (*Cunningham* v. *Northwest Improvement Co.*, 44 Mont. 180, 119 Pac. 554; *Davidson* v. *Davidson*, 52 Mont. 441, 158 Pac. 680; *Bull* v. *Butte Electric Ry. Co.*, 69 Mont. 529, 223 Pac. 514.)

Section 9327, Revised Codes, provides in particular those instances in which the trial by a jury may be had. It is as follows: "In actions for the recovery of specific real or personal

property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury, unless a jury trial is waived, or a reference is ordered, as provided in this code. Where in these cases there are issues both of law and fact, the issue of law must be first disposed of. *In other cases, issues of fact must be tried by the court,* subject to its power to order any such issue to be tried by a jury, or to be referred to a referee, as provided in this code.''

The plaintiff, the Butler Brothers Development Company, in its complaint seeks a judgment on a note and the foreclosure of a trust deed given to secure the payment of the note. The answer of Julius sets up a defense of failure of consideration and an affirmative defense of fraud. The court permitted the Butler Company, F. O. Butler, and Paul Butler to become parties to the action and join issue with Julius on his answer. This they did, and then Julius filed a cross-complaint against the Butler Company, F. O. Butler, and Paul Butler, alleging fraud and breach of contract in substantially the same allegations as were contained in his answer.

Actions for mortgage foreclosures are equitable and are triable by the court without a jury and they cannot be transformed into actions at law by merely raising an issue of law as a defense in the answer. (35 C. J. 166; 31 Am. Jur. 572; note in Ann. Cas. 1914C, p. 852.)

It is also well established that a court of equity once having jurisdiction of a suit will retain jurisdiction of it for all purposes and dispose of all questions in the case even though this involves a determination of legal issues. (31 Am. Jur. 567; 19 Am. Jur. 125; 35 C. J. 162.)

This court has likewise adopted the rule that in determining whether a jury trial should be had we must look to the primary right sought to be enforced by the complaint. The case of *Benson-Stabeck Co.* v. *Farmers' Elevator Co.,* 66 Mont. 395, 214 Pac. 600, holds that where the primary purpose of an action is recovery upon certain notes from certain guarantors and the assessment of the penalty for failure to file the annual state-

ment as directors of a corporation, the allegation in the complaint asking for a foreclosure of a mortgage against one of the guarantors does not deprive the defendants of a jury trial. In other words, because the complaint itself made legal demands as well as equitable, the defendants were entitled to a jury trial. Here the only relief demanded by the complaint is the equitable remedy of foreclosure.

The case of *Stevens* v. *Equity Mut. Fire Ins. Co.*, 66 Mont. 461, 213 Pac. 1110, holds that where the complaint sought reformation of an insurance policy—an equitable remedy—and the defendant joined issue on the reformation, then it was not error in not allowing a jury trial even though the answer set up legal defenses.

In the case of *Merchants Fire Assurance Corp.* v. *Watson*, 104 Mont. 1, 64 Pac. (2d) 617, this court adopted the general rules set out above, that when a court of equity properly takes jurisdiction of a controversy its jurisdiction is full and complete and it may render final judgment in relation to all matters in and growing out of the controversy. It held that the pleading of legal defenses by cross-complaint in an equitable action does not entitle defendant to a jury trial. The writer of this opinion dissented in that case, but only because in that case the equitable issues stood admitted. That is not true here.

We cannot say that the equitable issues have been admitted in the instant case so as to come within the rule of *Lehman* v. *Coulter*, 40 N. D. 177, 168 N. W. 724, cited in the *Watson Case*, supra. We are impressed by the reasoning in *Consolidated Wagon & Machine Co.* v. *Kay*, 81 Utah, 595, 21 Pac. (2d) 836, 840. There the action was to foreclose a chattel mortgage. The defendant admitted the execution of the mortgage but denied that any sum was due and alleged failure of consideration and fraud. There the court said: "The contention of the defendants that, because of the admissions of the answer, no issuable fact of equitable cognizance was presented by the pleadings, is hardly tenable. We think the proposition is stated too broadly. Under statutes such as we have and as generally obtain in other jurisdictions, a necessary part or basis of a mortgage is a debt

or other obligation to secure the payment or performance of which the mortgage is given. When the debt or obligation is denied, proof thereof is essential to the right of foreclosure, and, if the debt or other obligation falls, the mortgage falls. Here the mortgage was given to secure the payment of what then remained due and unpaid on the contract of purchase of the machinery, amounting to $1,183. By the complaint it is alleged that thereafter there was paid on the indebtedness $243, leaving a balance due and unpaid in the sum of $963. That balance so remaining due and unpaid was denied. It also is denied that the mortgage was given for a good consideration, and it was alleged that it was given without consideration. All that related to the right of foreclosure itself. Though the pleaded affirmative defenses in character were legal, yet they no more prevented or relieved the court from determining the whole issue than if the defendant had pleaded payment or *non est factum*. Because as to the pleaded defenses the burden of proof was cast on the defendants, again no more relieved the court from the duty and responsibility of determining the whole issue than if a plea of payment or of confession and avoidance had been interposed. We therefore are of the opinion that no error was committed in the court's ruling dismissing the jury and in determining the whole issue presented by the pleadings.'' (See, also, *Tiger Placers Co.* v. *Fisher,* 98 Colo. 221, 54 Pac. (2d) 891; *Crawford* v. *Hemmingway,* 116 Okl. 192, 244 Pac. 198; *Young* v. *Vail,* 29 N. M. 324, 222 Pac. 912, 34 A. L. R. 980, at page 1005; *Proctor* v. *Arakelian,* 208 Cal. 82, 280 Pac. 368.)

The case of *Healy* v. *Ginoff,* 69 Mont. 116, 220 Pac. 539, is relied upon by appellant but that case is not in point for there the equitable issues raised by the complaint were admitted and the answer consisted of two counterclaims raising issues of law only. Furthermore, the right of jury trial does not appear to have been raised in that case.

Here, as above noted, the complaint raises only equitable issues. Those issues are not all admitted by the answer. Additionally the answer and cross-complaint, besides setting up a cause of action for damages—a legal remedy—also asks equi-

table relief. It asks that the note and trust deed be cancelled and set aside, that the agreement of October 16, 1934, be specifically performed and for such "other and further relief as to the court shall seem meet and agreeable to equity." Since the complaint raises purely equitable issues, and since they have not been admitted by the answer, and since the answer also asks relief in equity as well as in law, we hold that the court did not err in refusing a jury trial.

The next point argued in the brief of appellant is that the ▮ laws of the state of Illinois govern on the point of interpreting the contract. It does not appear from the record that the court did not apply the laws of Illinois. Hence, we need not determine in this action whether the laws of Illinois or the laws of Montana control, nor need we determine what, if any, difference exists between the two.

The next point raised by appellant is that he is entitled to ▮▮ recover on the cross-complaint either upon the theory of fraud and deceit or for breach of contract. The record discloses that during the trial the court stated, "This is an action for fraud." It appears, however, that the court found there was no breach of contract on the part of the interveners, as well as that there was no fraud on their part, and hence if the statement made by the court were erroneous it did not adversely affect any right of appellant. There is evidence supporting the finding of the court that interveners did not breach the contract and likewise there is evidence supporting the conclusion that interveners were not guilty of fraud or deceit. Under familiar principles we are not at liberty to interfere with the court's findings if there be substantial evidence supporting them, and this even though the evidence be conflicting.

The next contention of appellant is that the facts and circum- ▮ stances leading up to and surrounding the execution of the October 16, 1934 agreement were admissible to prove fraud or breach of contract. The theory of appellant throughout the trial was that F. O. Butler and Paul Butler conspired to force Julius to return to the paper business by conniving to accomplish his financial ruin. The court permitted the proof to take

a wide latitude. While the court made statements purporting to restrict certain testimony for certain purposes, when the findings and conclusions were adopted, all objections upon which ruling was reserved during the trial were overruled. The findings disclose that the court did in fact consider all facts and circumstances leading up to and culminating in the contract of October 16, 1934, and it does not therefore appear that appellant was in anywise prejudiced by any statements made by the court which tended to evince a purpose to restrict certain evidence to certain purposes.

Appellant contends that fraud and conspiracy on the part of F. O. and Paul Butler are shown by undisputed evidence coupled with circumstantial evidence. We do not so view the record. True, many facts were undisputed. But others were in sharp conflict. Reasonable inferences to be drawn from the undisputed facts are more consistent with honest motives on the part of F. O. and Paul Butler and a desire to help Julius into a position of financial stability than with an intent to defraud. The record is in such condition that we cannot disturb the findings of the trial court on the subject.

Appellant argues that when a contract is ambiguous, parol evidence of circumstances leading up to its execution is admissible to explain its purpose. There can be no doubt concerning the correctness of this abstract principle of law. Whether the rule was transgressed to the prejudice of defendant is the question that concerns us. It is appellant's claim that the contract was breached by interveners. As to paragraph 1 of the contract which recites that the total outstanding obligations of Julius, as per attached list, approximate $44,000, it is conceded by everyone that there was no list attached to the agreement of October 16, 1934. Appellant contends that the list used in the negotiations was the list "A" to "P" inclusive as follows:

"Financial Obligations Referred to in 10/16/34 Agreement between F. O. B., P. B. and J. W. B.

A. Group 1 Ranches Western Creditors—see attached list .............................. $24,199.79

B. Group 2 Ranches Chicago Creditors—see attached list .............................. $703.51

C. Group 3 J. W. B.'s Western Creditors—see attached list .............................. 5,733.96

D. Group 4 J. W. B.'s Chicago Creditors—see attached list .............................. 746.55

E. Interest on the above four groups—estimate.... 1,616.19

33,000.00

F. Holter Interest for three years................. 2,500.00

G. Two years loss on Seven Up................... 6,000.00

H. Personals—Freight, clothing, Stotesbury $500, Seven Up Water System, etc................. 2,500.00

$44,000.00

"Items J. W. B. and F. O. B. Discussed and It was Agreed had be Taken Care of:

I. 10/16/34 to 10/16/35 Living expenses.......... 1,500.00

J. Charlie Carlson's fee which J. W. B. estimated at 1,000.00

K. Additional due Stotesbury estimated at........ 400.00

L. Possible Income Tax for 1930, 1931, 1932 and 1933 ................................ 25,000.00

M. Automobile ................................ 700.00

N. Adjustments in Group A to M Inclusive...... ?

O. Miscellaneous Financial Payments........... ?

P. Marion .................................. 15,000.00"

Interveners contend that items "I" to "P" inclusive were not in the list used in the negotiations. The findings of the court impliedly if not directly find this issue in favor of interveners. But appellant takes the view that if the list was not agreed upon in its entirety when the contract was made, it was subsequently ratified or agreed to by letters passing between Julius and his father F. O. Butler and by acting under the list with items "I" to "P" added. Concisely stated, appellant contends that by the contract of October 16, 1934, interveners agreed to pay all the outstanding indebtedness of Julius and

not only those contained in items "A" to "H" inclusive, as contended by interveners.

The court did not err in holding that interveners complied with the terms of the agreement of October 16, 1934. That agreement fairly construed together with the oral evidence submitted to explain the agreement did not specify that interveners should pay all the outstanding debts of Julius. If they became obligated to do so it was because of letters which passed between Julius and F. O. Butler or between the former and Reiher, who, under paragraph 7 of the agreement had jurisdiction and direction regarding the details of the agreement. These letters show that Julius added items "I" to "O" to the list and notified F. O. Butler of that fact. But the items are just as consistent with an accounting by Julius of the items going to make up those items contemplated by paragraph 3 of the agreement as an enlargement of the list of items embraced in paragraph 1. At any rate there does not appear in the letters any promise on the part of interveners or either of them to pay items embraced in paragraph 1 of the contract other than those aggregating $44,000 and embraced in the list from items "A" to "H".

Appellant contends that paragraph 8 of the agreement makes it plain that interveners agreed to pay all his debts. That paragraph provides in part: "The desire of all parties hereto, and the purpose of this joint effort, and understanding is to place Julius W. Butler in a permanently sound financial position." The effect of this paragraph is simply to declare the purpose of agreeing to pay the obligations particularly referred to and it was not intended as a catch-all so as to embrace all his debts and obligations. Were that the purpose there would have been no object or purpose in listing any of the items.

The next contention of appellant is that paragraph 2 of the contract has been breached by interveners. That paragraph provides: "If consistent with financial conditions, in the opinion of both parties of the first and second part, but not otherwise, the Thirteen Thousand ($13,000.00) Dollar mortgage on the Holter Tract will be paid on or before maturity,

which is January 1, 1938.'' The court was correct in holding that that paragraph gave the option to interveners to elect whether they would pay the Holter obligation or not to do so. Were we to say that it obligated interveners to pay that item, we would be making a contract for the parties different from the one they themselves made. If that item were to be paid at all events, it would have been easy to so state in the contract.

Appellant next contends that he was entitled to a release of the trust deed on demand by virtue of paragraph 6 of the contract. Paragraph 6 is not open to that construction. Before appellant was entitled to a release of the Montana properties, it was incumbent upon him to fully protect interveners by other security, which he failed to offer to do.

It is next contended by appellant that by paragraph 8 of the agreement interveners obligated themselves to see to it that appellant was placed on a sound financial basis and that the court erred in finding that appellant was unable to prove his ability to operate the property on a break-even basis. The contract, as we construe it, did not obligate interveners to place Julius on a sound financial basis. It simply obligated them to pay the sums therein stipulated and announces that the purpose of so doing is to place him in a sound financial position. Interveners performed their full duty to Julius under the contract by making the payments called for. If the court was correct in its first conclusion of law, and we think it was, then it is immaterial whether Julius was able to operate the property on a break-even basis. The privilege offered to Julius under paragraph 8 of the contract did not change the stipulations of the note and mortgage or trust deed. The mortgage or trust deed contained the usual acceleration clause, maturing the principal of the note upon default in the payment of interest or taxes, and expressly conferred the right of immediate foreclosure. Julius, being in default on the note and trust deed, forfeited the privilege conferred by paragraph 8 of the contract.

At the time of the trial of this action the defendant Julius Butler objected to the participation of J. M. Stotes-

bury in the trial. Stotesbury, during the early stages of this controversy, was an accountant and was employed by Julius Butler as such in tax matters and as an advisor in bookkeeping methods. The record contains testimony to the effect that Stotesbury conferred with Julius upon some matters which eventually became incidentally involved in this case.

The general rule is that an attorney cannot be an attorney for both adverse parties. (7 C. J. S., Attorney and Client, secs. 47, 823; 5 Am. Jur. 296; *In re Waddell,* 54 Mont. 597, 172 Pac. 1036; *Hovel* v. *Minneapolis & St. L. Ry. Co.,* 165 Minn. 449, 206 N. W. 710.) Nor does it affect the situation that there has been a termination of the relationship as to one adverse party. (7 C. J. S., Attorney and Client, secs. 48, 827; 5 Am. Jur. 297.) The obvious reason for the latter is that an attorney cannot use the information gained in confidence against the person confiding in him. However, this rule does not bar the attorney, when the relationship has terminated, from representing a client adverse to his former client if the matter in controversy is different or even though the controversy arises out of facts with which the attorney might have been familiar. Before appellant can complain of the participation of Stotesbury in the trial, he must show that the disclosures made in the former employment were used prejudicially against appellant. (See *Bent* v. *Priest,* 10 Mo. App. 543; *Price* v. *Grand Rapids & I. R. Co.,* 18 Ind. 137; *Flynn* v. *Neosho,* 114 Mo. 567, 21 S. W. 903; *Musselman* v. *Barker,* 26 Neb. 737, 42 N. W. 759; *Messenger* v. *Murphy,* 33 Wash. 353, 74 Pac. 480; *State* v. *Lewis,* 96 Iowa, 286, 65 N. W. 295.)

The records show that Stotesbury was not an attorney at law during the engagement with the defendant Julius Butler and it is not shown that information confidentially reposed in him was used to the detriment of appellant in the trial of the case. Nor does the record indicate that any information was imparted to Stotesbury which was prejudicially used against the defendant Julius Butler. We cannot say that the court erred in refusing to grant the defendant's motion.

Other questions raised by appellant have been considered by us but we find no warrant for disturbing the findings and judgment of the trial court.

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ERICKSON and ANDERSON concur.