[Civ. No. 15517.   First Dist., Div. One.   Dec. 28, 1953.]

WALTER T. BARKETT et al., Respondents, v. RAFFAELA BRUCATO, Appellant.

J. Bruce Fratis, Joseph L. Alioto and Walter F. Calcagno for Appellant.

Alvin Gerlack and Irving Schoenfeld for Respondents.

PETERS, P. J.—Plaintiffs, Walter and Adelaide Barkett, former tenants of Raffaela Brucato, brought this action against the landlord and others for damages for a constructive eviction in violation of the implied covenant of quiet enjoyment, for negligence, for a conspiracy to willfully and maliciously harass the plaintiffs, and for punitive damages. The jury exonerated all defendants with the exception of defendant Brucato, refused to award any punitive damages, but returned against Brucato a general verdict of $5,000. Defendant Brucato appeals from the judgment entered on the verdict, and from the order denying her motion for a judgment notwithstanding the verdict. The order is appealable. (Code Civ. Proc., § 963(2).)

The landlord, Raffaela Brucato, a contractor, William A. Alaimo, doing business as the Alaimo Company, and the contractor's manager, Roy E. Brousseau, are named as defendants in all four counts set forth in the complaint. The first count is for breach of the covenant of quiet enjoyment, alleging as the breach that defendant committed a series of described acts, including the construction of a third story over the second story flat rented by plaintiffs so as to expose their premises to the elements, and that, as a result, the premises were flooded during a rainstorm making the premises uninhabitable, and access to the leased premises was interfered with by that and other acts. Damages of $2,605.82 to furnishings, and injury to Mrs. Barkett's health in the amount of $15,000 are alleged, as well as $5,000 damages for the blocking up of plaintiffs' garage. The same damages are prayed for, and the same acts alleged in the second cause of action, which is based on negligence. The third cause of action alleges that after the plaintiffs discovered that defendant Brucato was charging an over-ceiling rental, defendants engaged in a conspiracy to annoy and harass the plaintiffs, by blocking the garageway, causing the flooding, refusing to clear a clogged drain, refusal to make other designated repairs, annoying plaintiffs on the telephone, and by threatening injury to plaintiffs if they did not move. $25,000 general damages for humiliation and embarrassment are prayed for, as well as $750 for loss in being compelled to move to premises with a higher rent, and $32.95 actual moving costs. The fourth cause of action asks for $10,000 punitive damages based upon the facts alleged in the conspiracy count.

Attached to the complaint is a copy of the lease between Mrs. Brucato and Mr. Barkett. It is for an upper flat of

a building in San Francisco and covers the period September 1, 1949, to August 31, 1950, with an option in the tenant to renew for two years, and provides for $175 per month rental. The lease contains the usual covenants to protect the landlord, and some special provisions. Paragraph 12 provides: "Lessor contemplates erecting a Pent House on the premises. In the event that all plans go through, Lessee herewith agrees to accept temporary inconveniences until the work is completed." Paragraph 2 contains the usual covenant that the premises are in good condition; that the tenant shall not alter or repair without consent; that the landlord is not required to repair except "such as may be caused by the elements or structural defects"; that the tenant will return the premises in good condition; and then provides: "That the lessee agrees . . . that the lessor shall not be liable for damage or injury to any person, personal property, or effects in said premises from any cause whatever."

The answer of defendant Brucato alleged that the lease as pleaded did not include a provision that the premises were leased furnished, alleged that such was the fact, denied the material allegations of the complaint, and set forth a cross-complaint, which was later dismissed. The defendant contractors denied the material allegations of the complaint, specially pleaded the waiver clauses, quoted above, and also raised the defense of contributory negligence. The jury brought in a verdict in favor of the defendant contractors so that on this appeal we are concerned only with defendant Brucato as appellant, and the plaintiffs as respondents.

The evidence in many respects is highly conflicting. On this appeal we are compelled to accept all the evidence and the reasonable inferences therefrom most favorable to respondents, and, at least where it is conflicting, to reject the evidence produced by appellant. So construed, the record shows the following: Respondents moved into the premises a week before the landlord submitted a final lease. Respondents testified that they leased the premises unfurnished. Before they moved in, appellant told them that she was contemplating building a penthouse on the roof of the premises; that she did not know when it would be built; that she was not sure it would be built during the year of the lease, or ever; and that she had applied for a building permit. She neglected to tell respondents that her application for such a permit had already been once rejected. Respondents offered to assist in getting

the permit. There is a grave conflict over whether appellant told respondents of the extent of the inconveniences that would be caused by such construction. Respondents also denied that they knew that appellant did not want to lease the premises or that they had induced her to do so against her will, or that the contractor had advised that the premises should be vacated during construction. Respondents admitted that they had agreed to accept inconveniences during construction, but testified that appellant stated that she would give them "lots of notice so you can move out." There is substantial evidence that appellant herself was contemplating moving into the upper flat before she leased it to respondents. There was also a conflict as to whether it had been orally agreed that a certain closet, part of the leased premises, would be surrendered by respondents if the construction work was done.

As part of the building in which the leased flat was located there was a double garage, one space for each flat. Respondents testified that it was agreed that a designated half of this garage was allocated to them, the appellant testifying that garage space was not assigned between respondents and the tenant in the lower flat.

The parties were quite friendly when the lease was executed, but shortly thereafter their relations began to steadily and rapidly deteriorate. One of the causes of friction was the continued presence of some of appellant's furniture, including a massive dining room set, which appellant, in spite of her prior promise to do so, refused to move. Friction also developed over the closet, before mentioned. But the major cause of friction arose when respondents discovered that the ceiling rental on the premises was $110, while the lease called for $175 per month, and made complaint to the O.P.A. and to appellant. The latter became very angry, stated that she would make respondents sorry they ever lived there, and threatened that she would evict them. For the first few months of the lease the respondents paid the rent with a $110 check, and the balance in cash. Even after discovering the overcharge, and reporting it to the O.P.A., respondents told appellant they would continue to pay the $175 a month if appellant would make needed repairs to the entrance light and doorbell. In reference to this overcharge it should be mentioned that on May 2, 1950, after respondents had vacated the premises, the O.P.A. retroactively, and as of December 13, 1949, increased the ceiling

rental to $145 per month. Of course, even then, the rent provided in the lease was excessive.

Shortly after respondents moved in, the doorbell to the upper flat failed to work, requiring that Mrs. Barkett go downstairs to admit callers. The two entrance lights were also out of order so that the entrance way was dark and unpleasant. In spite of repeated requests on the part of respondents, these repairs were not made, except that an unskilled workman was sent to the apartment by appellant, but he was unable to do the required work. The respondents also testified that a drain on the premises was stopped up with dead rats, mice and garbage, resulting in a nauseating odor in the flat that caused an adverse effect on the health of Mrs. Barkett, and that appellant, in spite of six separate complaints, refused to remedy the situation.

Construction of the structure over respondents' flat started about February 15, 1950. The preceding day appellant, on the advice of her contractor Alaimo that the tenants should be out before the new construction was undertaken, personally filed a petition with the O.P.A. to evict respondents because of "major improvements," thus representing that such improvements could not be carried out without major injury to respondents. Permission to evict was granted on March 7, 1950, several weeks after construction had started, but granted subject to the condition that: "Action to remove or evict the tenant shall not be commenced sooner than three months from February 14, 1950, date petition was filed." Thus, eviction could not lawfully have been accomplished until May 14, 1950. All of the acts here involved were performed long before that date.

The construction work was undertaken by the company of defendant Alaimo, under a cost plus contract containing a maximum ceiling of $14,200. Brousseau, superintendent for Alaimo, had charge of the job, and he consulted frequently with appellant. Construction started with the building of a full scaffolding, and then the roof of the building was torn off, thus exposing the ceiling of the upper flat of respondents, and then floor joists and a subfloor were constructed for the addition on the third floor. There was a period of about a month and a half between the removing of the roof and the storm of March 23, 1950, that caused the major damage complained of by respondents.

The differences between the parties became aggravated with the start of construction. The scaffolding was so erected

that it blocked the windows of respondents' flat. It also, on 15 separate occasions, blocked the front door of the apartment. In addition, an upright, an integral part of the scaffolding, partially blocked the garage, making entrance and exit therefrom very difficult. This condition was corrected for the other tenant in the building on instructions from appellant, but not for respondents. Respondents also testified that lumber four or more feet high was periodically piled in front of the garage over a period of six weeks, on which occasions use of the garage was prevented. On one occasion Mr. Barkett asked the contractors to move the lumber, and, upon their refusal to do so, Barkett, with the aid of several friends, moved the lumber onto the lawn. Appellant thereupon requested and secured from the district attorney a citation against Barkett for malicious mischief. The charges were dismissed at the hearing before the district attorney.

All during this period arguments between the parties occurred during which appellant made threats in addition to those already mentioned. After the scaffolding was erected appellant told respondents to move, and stated that if they did not she would "force" them to do so. When Mr. Barkett complained of the terrific pounding incidental to the removal of the roof, appellant told him to move if he did not like it, and that the pounding "is going to be worse than that. Why don't you move? We are going to make it just as tough for you as possible." Mrs. Barkett heard appellant tell Brousseau "I don't give a God damn what those bums want up there. I don't care if they move. Let them go. I want them out of there." Appellant told the contractors that the respondents were going to move; that she was going to evict them if they did not move, and she may have said she would harass them until they did move. She directed the workmen to disregard respondents' objections or requests, and to leave the scaffolding and lumber in front of the garage. Mrs. Barkett testified that from the middle of February, 1950, until they moved, her telephone would ring early in the morning four or five times a week; that no one responded, but there was merely a tapping on the line; that this made her exceedingly nervous and upset, causing her to leave the receiver off the hook and to complain to the telephone company. Mrs. Barkett believed that it was appellant who made these calls to annoy her.

One of the issues in the case was whether the construction involved was of a "pent house" or of a "third story," and whether the inconveniences were "temporary inconveniences"

as set forth in the waiver clause of the lease. Mr. Barkett testified that the structure was more than a mere penthouse, and was in fact a full additional flat, and that the construction was far more extensive than had been agreed upon. The inconveniences involved have already been partially described. Defendant Brousseau testified at the trial that in the construction business anything constructed on the top of a building smaller than the existing structure was a penthouse; that the structure involved was necessarily a penthouse because it had an open patio, was designed differently from, and was somewhat smaller than respondents' flat. But this testimony was seriously impeached by the use of Brousseau's deposition, in which he had testified that he had constructed "another floor," that it "was another story" and not a penthouse, because it looked like a third story in the building permits and its area was very close to that of the apartment underneath. He tried to explain these inconsistencies at the time of trial by stating that he had changed his mind after the deposition was taken.

Of considerable significance on this issue is the application for a building permit filed with the city. The Bureau of Inspection of the Department of Public Works denied the permit on the ground that the construction would permit four full floors of occupancy (there was a large rumpus room on the ground floor), but upon appeal to the Board of Permit Appeals the permit was granted. The application states that contemplated construction would create "an additional floor of occupancy" and would add "an additional story to the building." The work to be done is described in the application in detail and it concludes with the statement that the proposed construction aims to "change stair, construct new floor."

The most serious trouble between the parties occurred after the removal of the roof, thus exposing the ceiling plaster of respondents' flat to the elements during the rainy season. The contractor testified that he used the standard and accepted method to protect the property by covering the exposed area with three large tarpaulins, cleated together, and nailed down each night. But this method was not waterproof. Starting about the middle of March, 1950, it started to rain intermittently and water inevitably dripped into respondents' flat through the plaster, causing the ceilings to buckle and the walls to become very wet. But these difficulties were minor compared to what happened on the night of March 23,

1950. The tarpaulins were nailed down that night when the workmen left. It then started to rain very hard indeed, .74 of an inch falling in a short time. This rain was accompanied by a strong wind that tore the tarpaulins and ripped them loose in several places. Water poured through the subfloor of the new addition into respondents' flat. Water dripped through every ceiling and formed pools on the floor, causing it to warp. The canvas on the canvas walls began to come off, and all the clothing, linens, rugs and furniture in the apartment became wet. The waterlogged living room ceiling finally collapsed and streams of water ran into the various rooms. The respondents had to take refuge with neighbors because their bed was soaked with water.

There was a great deal of testimony as to the damage caused by the deluge to the personal property of respondents. The evidence shows that respondents' clothes, rugs and lampshades were soaked, clocks rusted, and the finish on furniture spoiled. An urn worth $500 was broken. Mrs. Barkett prepared a list, which is not complete, in which she estimated that it would cost $1,352.90 to make some of the necessary repairs. There is other evidence that the total damage to the personal property exceeded $2,500.

There was substantial evidence that, as a result of the noise, drain odors and other irritations, Mrs. Barkett became nervous and emotionally upset, and that, as a result of the wetting during the storm, she contracted a bad cold which stayed with her for three months and which required medication and medical care. The cold also caused a recurrence of a menopause condition that previously had been cured.

On either March 31st or April 1, 1950, respondents vacated the flat and leased other premises at $150 per month, thus establishing an additional item of damage of at least $5.00 a month for the balance of the lease period plus the two years of the option. It will be remembered that the. O.P.A. had retroactively raised the $110 ceiling to $145 a month as of December, 1949.

On the issue of the motive of appellant in trying to evict respondents, it was shown that after the respondents had vacated, appellant advertised the flat at $180 a month and actually rented it for $170. Appellant testified that, although she applied for permission to evict, she knew she had no legal right to evict but thought she was within her legal rights because respondents refused to cooperate. She admitted that she caused construction to start long before the O.P.A.

permit became effective. Under all the evidence the jury would have been justified in finding that appellant's actions were maliciously motivated.

On the appeal it is basically the contention of appellant that she cannot be held liable at all on the second cause of action for negligence, or the third cause of action for conspiracy, because the only negligence that was shown was that of the contractors, and they were exonerated of all negligence, and were also exonerated on the conspiracy count. Therefore, says appellant, she must have been held liable solely on the first count charging a breach of the covenant of quiet enjoyment. Having established these premises to her satisfaction, appellant then argues that the waiver clauses, as a matter of law, exonerated her of all liability on the first cause of action, as well as on the second based on negligence.

These basic premises are all wrong.

As to the second cause of action based on negligence, it is appellant's theory that if the waiver clauses are not applicable so as to exonerate her, she cannot be held liable for that negligence because it was the negligence of the contractors, and she can be held liable, if at all, only on the theory of *respondeat superior*. It is contended that a verdict exonerating the agent necessarily exonerates the principal.

It is undoubtedly the law that where the alleged negligent act of the agent was not directed or ratified by the principal and where the sole basis of the claimed responsibility of the principal is the doctrine of *respondeat superior*, the exoneration of the agent exonerates the principal. (*Bradley* v. *Rosenthal*, 154 Cal. 420 [97 P. 875, 129 Am.St.Rep. 171]; *Johnston* v. *City of San Fernando*, 35 Cal.App.2d 244 [95 P.2d 147].) The rule of these cases is not here applicable.

In the instant case the jury could very well have found that in the absence of an emergency the removing of the roof of an occupied dwelling during the rainy season of the year constituted negligence whether or not the contractors were negligent. Over this aspect of the work appellant acted independently, and it was she and she alone who decided that the work should be done. Therefore, unless the waiver clauses are applicable, the verdict can be sustained on the second cause of action charging appellant with negligence.

Equally fallacious is the contention that because the jury exonerated all defendants except appellant on the conspiracy count, and failed to award any punitive damages at all, appellant cannot be held on the conspiracy count. The argument

is predicated on the fallacious premise that a finding of civil conspiracy cannot be upheld against but one person, that is, that a person cannot conspire with himself. ██ Some general language to the effect appears in some of the cases (see *Rapaport* v. *Forer*, 20 Cal.App.2d 271 [66 P.2d.1242]), but as that case held, it is equally well settled that in a civil conspiracy it (p. 278) ''is the wrong done and the damage suffered pursuant to a conspiracy rather than the conspiracy itself, which is the cause of action.'' It is the general rule throughout the United States that in civil cases it is the damage to plaintiff that is the gist of the action, and that the charge of conspiracy is merely a mechanism affecting the rules of evidence or the liability of those who conspire but who do not act. Therefore, the allegations of conspiracy are mere surplusage in a case where the conspiracy itself is unproved but there is evidence of actionable conduct on the part of one defendant. Such conduct is actionable, regardless of the conspiracy, except in those cases, of which the instant case is not one, where an essential element of the tort is group action. (See annotation collecting many cases, 152 A.L.R. 1147.) This has been the rule in California for many years. (*Burckhardt* v. *Woods,* 124 Cal.App. 345 [12 P.2d 482]; *More* v. *Finger,* 128 Cal. 313 [60 P. 933]; *Revert* v. *Hesse,* 184 Cal. 295 [193 P. 943]; *Blair* v. *Guarantee Title Co., Inc.,* 103 Cal.App. 260 [284 P. 719]; *Mox, Inc.* v. *Woods,* 202 Cal. 675 [262 P. 302].)

Here the basic tort alleged in the third cause of action was the willful wrongful eviction, that is, the breach of the covenant of quiet enjoyment, accomplished by a series of intentionally annoying acts designed to compel the tenant to vacate. Such a tort (as distinguished from an action for breach of the covenant of quiet enjoyment) is recognized in the law. ██ Section 822 of the Restatement of Torts defines this tort as follows:

''The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if,

'' (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and

'' (b) the invasion is substantial; and

'' (c) the actor's conduct is a legal cause of the invasion; and

'' (d) the invasion is either

'' (i) intentional and unreasonable; or

"(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultra-hazardous conduct."

California recognizes the existence of such a tort. (*Tooke* v. *Allen*, 85 Cal.App.2d 230 [192 P.2d 804]; *Sanders* v. *Allen*, 83 Cal.App.2d 362 [188 P.2d 760]; *Butler* v. *Allen*, 73 Cal. App.2d 866 [167 P.2d 488].) Removing the roof of an occupied dwelling during the rainy season in the manner here done, and the other acts already described, clearly fall within the above definition. The jury could have held appellant for an independent tort upon the third cause of action by reason of her intentional and even malicious conduct already described. When this conduct is considered, together with the attempt to secure permission to evict respondents, it is a reasonable inference that the construction was undertaken for the purpose of eviction so that appellant could once more obtain the illegal profits of rent overcharging.

This brings us to the next basic contention of appellant, and that is, that respondents, in the lease, validly waived damages for any damage to person or property caused by appellant. This contention applies to the causes of action alleged on the first and second counts of the complaint. It does not apply to the intentional acts complained of in the third count of the complaint. There are two clauses of the lease relied upon. Both have been quoted in full, *supra*. One is a special waiver clause that provides that in the event a "pent house" is constructed during the lease period the respondents agree "to accept temporary inconveniences until the work is completed." The other is a general waiver clause and is to the effect that respondents agree that appellant "shall not be liable for damage or injury to any person, personal property or effects . . . from any cause whatever." The trial court ruled that this last quoted clause operated to free appellant from liability for damage to the personal property under the first count, but did not extend to other elements of damage alleged. The jury was also instructed specifically that the waiver clause did not apply to impairment of health, but only to injuries, and that Mrs. Barkett could recover for impairment of health if caused by appellant's negligence. Appellant contends that the general waiver clause last quoted, as a matter of law, operated to release her from all claims of damage to person as well as property, and that the trial court committed error in limiting the

application of the clause to damage to the property, and then only as to the first count.

There are cases holding that a provision such as is here involved does operate to exculpate a person from the consequences of his own negligent conduct. (See, particularly, *Werner* v. *Knoll*, 89 Cal.App.2d 474 [201 P.2d 45], and *Inglis* v. *Garland*, 19 Cal.App.2d Supp. 767 [64 P.2d 501]. See, also, *Kushner* v. *Home Service Co.*, 91 Cal.App. 692 [267 P. 555]; *Nichols* v. *Hitchcock Motor Co.*, 22 Cal.App.2d 151 [70 P.2d 654]; *Stephens* v. *Southern Pac. Co.*, 109 Cal. 86 [41 P. 783, 50 Am.St.Rep. 17, 29 L.R.A. 751]; *Northwestern M. F. Assn.* v. *Pacific etc. Co.*, 187 Cal. 38 [200 P. 934]; but, see, *Dieterle* v. *Bekin*, 143 Cal. 683 [77 P. 664]; *Taussig* v. *Bode & Haslett*, 134 Cal. 260 [66 P. 259, 86 Am.St. Rep. 250, 54 L.R.A. 774].) These cases hold that the matter is simply one of interpreting a contract; that both parties are free to contract; that the relationship of landlord and tenant does not affect the public interest; that such a provision affects only the private affairs of the parties. They hold that such a clause will exempt the landlord from liability for injuries to the tenant caused by the negligence of the landlord and prevents the landlord from being held for a breach of the covenant of quiet enjoyment based on such negligent acts. These California cases exempting the landlord from liability all deal with what might be called passive negligence. They usually involve injuries caused by some piece of equipment or machinery inherently defective leased or loaned to the tenant by the landlord, or injuries caused by the elements not aggravated by the landlord, or injuries caused by the negligence of other tenants or individuals for whose acts the landlord might otherwise be liable. The case of *Werner* v. *Knoll, supra,* is typical, and perhaps the strongest case in California upholding such clauses so as to exonerate the landlord for injuries caused by his negligence. That was an action for the wrongful death of the son of the tenant alleged to have been caused by a latent defect in a tractor owned by the landlord and used by the tenant on the leased premises. The lease exempted the landlord "for any damage arising from personal injuries sustained by any person or persons, in, on, or about said premises, from any cause whatsoever." (P. 475.) The appellate court held that such clause exonerated the landlord from the claimed liability. The court held that section 1668 of the Civil Code only declared unlawful contracts exempting one "from responsibility for his

own fraud, or willful injury . . . or violation of law, whether willful or negligent," and that the word "negligent" in the section modified "violation of law." The court also held that, although the waiver clause was all inclusive so as to purport to even include injuries caused by fraud and willful acts, and therefore to that extent was void, such void portion was severable.

The problem has two basic aspects. First, the waiver clause must be interpreted—was it intended by the parties to include the liability in question? There was no doubt that this was so in the Werner case, and the court devoted no space to a discussion of that problem. Second, what is the proper interpretation and application of section 1668 of the Civil Code? That section provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

The Werner case interpreted that section as invalidating contracts that purported to exempt one for the consequences of his fraud, or willful acts, or acts in violation of the law whether willful or negligent, and then held that the word "negligent" modified only "violation of law." Were the question one of first impression, this interpretation might be questioned. The section provides that any contract purporting to exempt one from responsibility for "his own fraud," "willful injury to the person or property of another," and "violation of law" are "against the policy of the law." The phrase "whether willful or negligent" is found after this enumeration, and is set off from the threefold enumeration by commas. It is a possible interpretation to hold that the "willful or negligent" clause modifies all three of the prior clauses, and is not limited to a "violation of law." Specifically, the section could mean that it is illegal to attempt to contract away any liability for acts caused by "willful injury to the person or property of another . . . whether willful or negligent." This would be one way of expressing, somewhat awkwardly, the distinction between "willful," that is, active, positive or affirmative negligence, and passive negligence.

However, the Werner case and perhaps other cases have interpreted the section differently, and we are not inclined to question that interpretation at the present time. The

importance of the possibility of such an interpretation is that it serves to highlight the fact that many state courts, including those of California, have reached precisely that result not by interpreting statutes similar to section 1668, but by interpreting all-inclusive waiver clauses as not intended to include acts that amount to active, affirmative negligence. There is a marked tendency in the more recent cases involving the landlord and tenant relationship to hold that by such clauses the parties could not have intended to provide that the landlord should not be liable for acts amounting to active and affirmative negligence, and to limit such clauses to injuries caused by defects resulting from wear or tear, inherent defects, the elements, and not actively aggravated by the landlord, or to injuries caused by other tenants. In other words, these cases hold, based on the presumed intent of the parties, that such general clauses were never intended to immunize the landlord from responsibility for his acts of affirmative negligence. (See annotation in 175 A.L.R. 8, particularly pp. 89 to 92, where cases from many states are collected and discussed; see, also, annotation in 26 A.L.R.2d 1044, pp. 1055 to 1056, where cases from California, New York, Washington and New Jersey are discussed.)

California has definitely aligned itself with this school of thought. The leading case is *Butt* v. *Bertola*, 110 Cal.App.2d 128 [242 P.2d 32]. In that case it was specifically held that the rule of the *Werner* v. *Knoll* and *Inglis* v. *Garland* cases, *supra*, did not apply to acts amounting to affirmative negligence. ■ The rationale of the opinion is that a general waiver clause, independently of section 1668, will not be interpreted, in the absence of clear, positive and specific language, to include acts amounting to affirmative negligence. The court, after discussing at some length the Werner and Inglis cases, concluded (p. 140): "Such decisions are not persuasive of a different view than that which we have expressed. We observe, also, that the trend of decisions is to exclude from such general clauses the exemption of a landlord from the consequences of his own affirmative negligence; i. e., a species of exemption not intended by the parties unless clearly and in more specific terms expressed," citing with approval the annotation in 175 American Law Reports 8. The negligence in the Butt case was in fact nonaction, that is, the failure to repair after requests to do so. This was held to be (p. 138) "at the very least, active or affirmative negligence, not mere ordinary negligence."

It is quite apparent that the negligence here involved, and the acts offered in support of counts one and three of the complaint, all constituted at least active negligence if they were not, in fact, willful. So far as the failure to repair the drain, doorbell, lights, etc., after requests to do so is concerned, they are precisely of the same nature as the acts involved in the Butt case. It is equally clear that appellant knew or should have known that the removal of the roof during the rainy season would injure the exposed flat. If such act constituted negligence it was active and not passive negligence.

It is true that the trial court's instructions on this subject were not all correct. But since, as a matter of law, the negligence, if any, was active and not passive, the instructions even though erroneous, were more favorable to appellant than the law permits. This is particularly true of the instruction to the effect that the waiver clause did not apply to impairment of health because impairment was not an injury within the waiver clause, and that because of the waiver clause the respondents could not, under the first count, recover for injury or damage to their personal property. Those instructions were wrong in that the waiver clauses, as here construed, had no effect at all on the question of the liability here involved. But the errors were in favor of appellant. Respondents have not appealed. Appellant cannot complain of errors in her favor.

There is another argument about these waiver clauses discussed by the parties. Respondents contend that even if the waiver clauses were intended to exonerate appellant from responsibility for the very acts here involved, such clauses would be void because in violation of the Emergency Price Control Act and Housing Regulations. There can be no doubt that during the emergency covered by the federal act the renting of property ceased to be a private matter and became impressed with a public use. Under the regulations issued by the federal government the landlord was required to furnish the same space, services and equipment as were furnished on the date rent ceilings became effective, and before services could be decreased a petition had to be filed by the landlord and permission secured from the O.P.A. It is argued that a waiver clause that would permit the landlord, without liability, to render the premises untenantable, and therefore necessarily decrease the services, necessarily violates these regulations and therefore would be

void, not only being in violation of public policy, but also of section 1668 of the Civil Code in that it would be "in violation of law." This argument may be sound. In support of it is cited the four-to-three decision of the Supreme Court in *Lovett* v. *Bell,* 30 Cal.2d 8 [180 P.2d 335]. The reasoning of the majority in that case would seem to support respondents' argument. The difficulty of applying that argument to the instant case is that the terms and conditions of prior registration of these premises with the O.P.A. is not in evidence. In spite of some confusion in the authorities as to who has the burden of proof in such a case (see *Wheeler* v. *Bainbridge,* 84 Cal.App.2d Supp. 849 [191 P.2d 134]; *Lester* v. *Beer,* 74 Cal.App.2d Supp. 984 [168 P.2d 998]; but, see *Levitt* v. *Glen L. Clark & Co.,* 91 Cal.App.2d 662 [205 P.2d 747]), we think the burden should rest upon the party seeking relief, in this case, the respondents. It should also be mentioned that this theory was never brought to the attention of the trial court. For these reasons this argument is not considered controlling on this appeal.

The special waiver clause by which the tenant agreed "to accept temporary inconveniences" if a "pent house" was constructed, is not here applicable. The trial court left it to the jury to decide whether the construction ordered by appellant was of a penthouse or was of a type not contemplated by the above clause. It instructed that the penthouse clause exonerated the appellant only if the structure was found to be a penthouse. This was a correct instruction. The facts have already been set forth on this issue. Certainly it was a fact question as to whether the structure was of a type covered by the lease, and certainly, as already pointed out, there was a direct, material and substantial conflict on this issue. Appellant argues, nevertheless, that the structure was a penthouse as a matter of law. She defines a penthouse as a "small building on the roof of a larger edifice," and then tries to prove that this structure was just that. In doing so, she picks out some isolated statements made by respondent Barkett in relation to another subject matter, ignores Barkett's testimony in chief, ignores the fact that Brousseau's statements at the trial were impeached, and ignores the voluntary description made by her in the application for the building permit. Thus it is obvious that whether the structure was or was not included within the waiver clause was a question of fact, and the trial court correctly so instructed.

Moreover, it should be pointed out that even if the structure were a penthouse, the jury could have found that the episodes here sued upon by reason of their nature, repetition and duration were more than mere "temporary inconveniences."

The last contention of appellant is that the $5,000 award is excessive. In this argument appellant assumes that the award is predicated solely upon injury to health. Based on this premise, it is urged that the only injury to health shown was a nervous upset condition and a cold. This argument ignores other items of damage such as damages for wrongful eviction, for blocking access, damages for failing to make repairs, the damages caused by having to re-rent at a higher rate, and costs of moving, and damages under the third cause of action, regardless of negligence, for willfully causing damage to the personalty. This last item alone totaled at least $1,200, and there is evidence that it amounted to over $2,500. The judgment is not excessive.

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.