**B. F. GOODRICH CO.**

v.

**NAPLES et al.**

No. 15119.

United States District Court
S. D. California, Central Division.

May 24, 1954.

**346**

, Holley, Tackabury & Johnston, George W. Tackabury, Lyndol L. Young, Los Angeles, Cal., for plaintiff.

Glenn A. Lane, Los Angeles, Cal., for defendant Naples.

Joseph K. Coady, Bellflower, Cal., for defendant Klingelberg.

Slate & Sawtelle, Houston H. Slate, Los Angeles, Cal., for defendants Robert L. Baier, Economy Paint & Waterproofing Co., a corporation, Economy Metal Fabricating Co., a corporation.

James B. Hudson, Los Angeles, Cal., for defendants Page Noll and Associated Roof Company, a corporation.

Edmund F. Barker, Montebello, Cal., for defendants Martin Hyman, Henry B. May, Henry B. May Co., S. A. Cox and M. L. Ward, individually and Cox & Ward Machine Shop; Troy Sheet Metal Works.

Otto A. Gerth, Vista, Cal., for defendants Harry M. Lukens, and Harry M. Lukens Co. and Tom Lukens.

YANKWICH, Chief Judge.

By an amended complaint the plaintiff seeks to recover in one cause from Henry Naples and Julia Naples the sum of $69,-876.52. By separate causes of action the plaintiff seeks to recover against the Naples and certain individual defendants various amounts, every one of which is not in addition to, but as a part of the whole recovery sought by the first cause of action against the Naples. The plaintiffs also attempt to make each of the defendants sued separately for various amounts liable for the whole amount.

Following discussion on a Motion to Dismiss at the conclusion of plaintiff's case, in which the Court expressed doubt as to whether the evidence was sufficient to make each of the defendants sued liable for the whole, the plaintiff, while not abandoning the first cause of action against all but the Naples, stated that it would not be pressed. As the matter is now before the Court on the merits, it is sufficient to state that, in the Court's opinion, while, as will appear, the individual defendants, other than Naples,

are liable for the amounts proved in the record as to themselves, there is no evidence to show that any of them knew or participated in any dealings between Naples and the others. So that, even under the more liberal federal rules of conspiracy, the individual defendants, while guilty of specific conspiracies with Naples, were not participants in any between Naples and the others.[1]

By "conspiracy" we mean "civil conspiracy" in the sense in which it is used in the law of California in order to hold persons who are in concert of action with a fiduciary liable to the principal for the acts done by the agent or employee to the detriment of the principal.

■ As the sole basis for federal jurisdiction is diversity arising from the fact that the plaintiff is a New York corporation and a citizen and resident of the State of New York, while the defendants are residents of California, the rights of the parties must be determined according to California law.[2]

As the Supreme Court put it very succinctly:

"The essence of diversity jurisdiction is that a federal court enforces State law and State policy."[3] In diversity cases the federal district court becomes, in effect, "another court of the State".[4]

## I
## The California Law of Fiduciaries

■ In dealing with the legal principles applicable, we advert to the facts behind the meager details of the complaint. Despite statements by the high courts of California, which deprecate the use of the common count as contrary to the requirements of the Code of Civil Procedure which California has had for over a century,[5] the California courts have hesitated to abandon their own early recognition of the common count, *as though a property right can arise in a form of pleading*. And they have sanctioned its use in cases which are really actions in tort in which the principal, instead of general damages, tries to recover the moneys which the tort-feasor has obtained.[6] This attitude has prevailed up to the present time.[7]

So, while the Complaint is cast in the form of common counts, the recovery is sought because of the secret profits received by Henry Naples during the years 1948 to 1951 while in the employ of the plaintiff.

This type of action is sanctioned by a series of decisions over the course of years.[8] On the procedural side, these cases give effect to the common-law principle which was expressed in the verse:

1. Kotteakos v. United States, 1946, 328 U. S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Canella v. United States, 9 Cir., 1946, 157 F.2d 470, 477–479.

2. Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 108–109, 65 S. Ct. 1464, 89 L.Ed. 2079; Angel v. Bullington, 1947, 330 U.S. 183, 191, 67 S.Ct. 657, 91 L.Ed. 832; Ragan v. Merchants Transfer & Warehouse Co., 1949, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520; Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 555–556, 69 S.Ct. 1221, 93 L.Ed. 1528.

3. Angel v. Bullington, supra Note 2, 330 U. S. at page 191, 67 S.Ct. at page 662.

4. Guaranty Trust Co. of New York v. York, supra Note 2, 330 U.S. at page 108, 65 S.Ct. at page 1469.

5. Pike v. Zadig, 1915, 171 Cal. 273, 152 P. 923.

6. Philpott v. Superior Court, 1934, 1 Cal. 2d 512, 525, 36 P.2d 635, 95 A.L.R. 990; and see, Joseph I. King, The Use of the Common Counts in California, 1941, 14 So.Cal.L.Rev. 288.

7. Weitzenkorn v. Lesser, 1953, 40 Cal.2d 778, 793, 256 P.2d 947.

8. Fink v. Weisman, 1933, 129 Cal.App. 305, 317, 18 P.2d 961; Los Angeles Drug Co. v. Superior Court, 1936, 8 Cal.2d 71, 74, 63 P.2d 1124; Bank of America Nat. Trust & Savings Ass'n v. Hill, 1937, 9 Cal.2d 495, 499, 71 P.2d 258; Savage v. Mayer, 1949, 33 Cal.2d 548, 551, 203 P.2d 9; Kinert v. Wright, 1947, 81 Cal.App.2d 919, 924–925, 185 P.2d 364; Steiner v. Rowley, 1950, 35 Cal.2d 713, 221 P.2d 9; Earl v. Saks & Co., 1951, 36 Cal.2d 602, 610–611, 226 P.2d 340; Strutzel v. Williams, 1952, 109 Cal.App. 2d 512, 515, 240 P.2d 988.

"Thoughts much too deep for tears pervade the court,

When I assumpsit bring, and, godlike, waive the tort."

 On the substantive law side, they are grounded upon the principle that an agent or employee is not permitted to make any secret profit out of his agency, and that beyond his agreed compensation, the agent is not entitled to any of the benefits of a transaction in which he engages for the principal. If he makes any unbeknown to the principal, the principal is entitled to recover them as a fraud upon the relationship. And all who participate in it are liable to the principal along with the agent, despite the fact that the participant, other than the agent, may not have benefited from the transaction. Their participation is a civil wrong resulting in damage, and the doctrine of civil conspiracy is resorted to merely in order to fasten joint liability on all participants, whether they gain anything from the transaction or not.[9]

As the Supreme Court of California has put it:

"The advantage gained in charging a conspiracy is that the act of one during the conspiracy is the act of all if done in furtherance thereof, and thus defendants may be held liable who in fact committed no overt act whatsoever and gained no benefit therefrom."[10]

But, notwithstanding the waiver of the tort, the three-year statute of limitations applies.[11] And the strict rules relating to proof of circumstances of discovery to begin the running of the statute applicable to ordinary fraud cases do not apply to this type of fraud which has its inception in a fiduciary relation.[12]

## II
### The Relationship of the Parties

The principles just declared spell out the liability on the part of all the defendants sued herein, unless one believes the facts narrated by Naples and some of the defendants at the trial,—most of which are contradicted by contemporaneous evidence, including statements by Naples and some of the contractors before the controversy reached the courts.

The controversy, of course, turns around the actions of Naples. Naples was a minor employee of the plaintiff by whom he was employed first as a draftsman beginning some time in 1943. His classification was changed as of January 2, 1951, to that of engineer. He did not have an engineering degree from any university. However, in two years at a naval academy, and later a year at California institutions, and through home courses, he acquired engineering knowledge sufficient to qualify him as a licensed engineer in the State of California. He was a subaltern under the supervision of another engineer in the drafting room. One of his tasks was to initiate inquiries of contractors as to construction jobs to be done at the plant. Upon the basis of these inquiries, a contract was let by the Purchasing Department to the best bidder and approved by the plant manager.

After an inquiry reached him, Naples discussed the price with the contractor who was to do the work. To the quoted price he added a profit which was to be paid to him individually, or under the name of Gregg Engineering Company,

9. Revert v. Hesse, 1920, 184 Cal. 295, 301–303, 193 P. 943; Mox, Inc. v. Woods, 1927, 202 Cal. 675, 678, 262 P. 302.

10. Mox, Inc. v. Woods, supra Note 9, 202 Cal. at page 678, 262 P. at page 303. See, California Auto Court Ass'n, Inc. v. Cohn, 1950, 98 Cal.App.2d 145, 149, 219 P.2d 511; Machado v. Katcher Meat Co., 1951, 108 Cal.App.2d 1, 4–6, 237 P.2d 715; Globe Dairy Lunch Co. v. Joint Executive Board of Culinary Workers, 1953, 117 Cal.App.2d 190, 193–194, 255 P.2d 94; Barkett v. Brucato, 1953, 122 Cal.App. 2d ——, 264 P.2d 978.

11. California Code of Civil Procedure, § 338, subd. 4.

12. Rutherford v. Rideout Bank, 1938, 11 Cal.2d 479, 486–487, 80 P.2d 978, 117 A.L.R. 383; Adams v. Harrison, 1939, 34 Cal.App.2d 288, 293–294, 93 P.2d 237.

or Lance Engineering Company. There were no such entities as Gregg Engineering Company or Lance Engineering Company. Neither had complied with the law of California relating to registering a business under a fictitious name.[13] They were, as Naples admits, non-existent. Their identity was not only concealed from Naples' employers, but from at least one bank with whom Naples was doing business, to whose representatives he introduced himself as George M. Gregg, and explained the fact that the mailing address was at the motel where he was living, by stating falsely that he was a recent arrival from San Francisco, and was using that address until he acquired a permanent business address.

The contract was let by the Company to one of the bidders. But the evidence shows that Naples, in most of the instances with which we are concerned, had arrangements as to additional profits to be paid to him with more than one bidder as to each job, so that he would receive these profits no matter who received the contract.

At the trial, Naples claimed that these profits were received by him pursuant to an understanding had between him and L. R. Keltner, the Manager of the Goodrich plant at Los Angeles, whereby he was permitted to receive these moneys from the contractors for performing additional engineering services after hours, in order to compensate him for the loss of overtime, which he claimed Keltner had abolished.

This reason taxes credulity. At no time did Naples' alleged overtime exceed an average of $100 per month. And it is certain that the executive of a large industrial plant would not allow an employee, *no matter how underpaid*, to receive profits running into more than $50,000 over a period of about three years to compensate for loss of a small amount of monthly overtime.

Indeed, there is not one phase of the story told by Naples to explain these profits that is worthy of belief. It is in-credible than a man of Naples' limited experience should have been allowed by the manager of the plant or by his immediate superior, the plant engineer Edwin S. Park, to perform for contractors the type of engineering services he claims to have performed, or to have supervised for the contractors on the various installations, *after hours and over week ends*, and then *also been allowed to accept the work for his employer when completed*.

More, this extensive engineering work that ran into tens of thousands of dollars is not *exemplified by a working paper, diagram or drawing, much less a blue print, that any of the contractors or Naples were able to produce at the trial*. The only ones produced were those prepared by the Company and *the Company's employees, including Naples,* to guide the contractors and for which the contractor was not expected to pay. Many of the purchase orders referred to specifications and, at times, to additional instructions or directions to be given by Naples. One such purchase order issued by the defendant to Troy Sheet Metal Works read:

"Furnish and Install:

"Ventilation systems for No. 1 and No. 2. Banbury motors.

"Material, equipment, and workmanship to conform to Drawing G–27775 and BM No. 19211 items 1 through 12 and BM No. 19212–V items 1 through 6, except items 3 (7½ H.P. Motors)

"*Per our Mr. Naples' instructions.*"

Several purchase orders to another contractor, Cox and Ward, have similar instructions. One reads:

"*See Mr. Naples of the Engineering Dept. for details.*"

Another reads:

"*Per sketch to be drafted by Mr. Naples.*"

A third one reads:

---

13. California Civil Code, § 2466.

"Above work to conform to drawing PB–218, which is attached.

"Kindly return drawing with quotation.

"*See our Mr. Henry Naples for location of proposed job.*"

A purchase order accepted by the defendant Economy Paint and Waterproofing Company related to a paint job which was particularized in this manner:

"Clean and paint designated parts of our plant at 5400 E. Olympic Blvd. as follows:

"Prepare:

"All ceiling area from bottom cord truss line to underside of wooden roof and all overhead structural steel and misc. equipment to be thoroughly cleaned by wire brushing loose paint, air blowing, and a grease-remover solution application to areas where lint, grease, etc., are not removable by air blowing. Ceiling area to start from west brick wall of tire room Col. line '51' between lines 'C' and 'E' the next bay from north building bay extending eastward to Col. line 28.

"Ceiling between Cols. 34 to 40 line 'C' and 'E' to have all paint removed and apply one coat of wood primer and sealer.

"All floor equipment and stock to be completely covered with dust proof paper or cloth.

"Sprinkler heads on all fire protection roof piping to be covered.

"Apply one coat of sprayed paint:

"All ceiling area is described above from Cols. 28 to 51 between lines 'C' and 'E' to be painted with Pittsburgh paint #UC–10701 fume and grime resistant eggshell white to be furnished by the B. F. Goodrich Company.

"All work to be completed between August 27 and September 4, 1950."

This was a paint job described in such detail that any contention that it called for "expert" engineering is the acme of absurdity.

It is to be noted also as to this job and others that they had to be done over week ends when the plant was not in operation and over a short period of time —the period designated being nine days. Clearly, neither the nature of the work nor its duration called for "large", if any, engineering.

Significant also is the fact that these purchase orders bear the following stamp:

"Work completed, approved for payment"

and the signature

"Henry Naples."

One inquiry for price for Henry B. May Company contains the following specification:

"Inquiry for price dated April 6, 1951:

"Fabricate and Install: 1–16 ga black iron guard for the No. 4 Calender chain drive * * * as per attached sketch dated 3/28/51."

This inquiry includes a sketch on a printed Goodrich Co. form. Several other inquiries for the same contractor contain the expression

"Please return sketch with quotation."

In a statement given to the Company dated August 28, 1951, the sole owner of the Henry B. May Company describes the method of "padding" the bids in this manner:

"I meat (met) Henry Naples for the first time at my business location. At this time he took me over to the Goodrich plant and asked me for bids on two sheet metal jobs which I gave him verbally. Then he told me to send in a written bid to Goodrich at a price which Naples quoted to me which was higher than my verbal bid. He told me that I was to give him the difference between my verbal bid and the price I quoted in writing as a kickback to Naples which he said was an engineering fee for his procuring the work. After Goodrich paid me by

.check I was billed by Naples under the name of *Gregg Engineering Co.* of Huntington Park, California and I paid Naples or the Gregg Engineering Co."

The invoices presented by Gregg Engineering Co. to Associated Roof Company identified the nature of the work claimed to have been done. One such invoice read:

"No. C–1782—Water Bag Painter guard for drive unit

"No. C–1790—Stainless Steel panels for overhead Palmer Bee soap-spray unit.

"No. C–1874—Blower duct for overhead Fan unit for plate die tuber

"No. C–1874—Panels for deflection of water spray in camel back cooling tank

"No. C–1874—Piping system for dishwasher in the cafeteria."

Another reads:

"11—Guards for tire mchs. P.O. No. C–11297

"1—Guard for the northside of cement unit on camel back tuber P.O. No. C–11297

"Stainless steel panels for Palmer-Bee unit. P.O. No. 11296.

"1—Truck for bead scrap P.O. No. C–11721.

"1—Stainless St. Hood for Tube tuber P.O. No. C–11545.

"6—Trays for leaf trucks P.O. No. C–11721."

And a third one:

| | |
|---|---:|
| "Heater Roofing No. C–1489 | 258.00 |
| "Stn. Steel Carbon Blk. Hopper No. C–1280 | 150.00 |
| "Stn. Steel reline cooling tank No. C–1644 | 2000.00 |
| "Stn. Steel Dishwasher Cafeteria No. C–1788 | 378.00 |
| | 2786.00" |

The amount of Naples' charges on this item is, in itself, a revelation of the true nature of these transactions. The intermediary between Naples and the plaintiff was **an officer of the company named Hal Beers**, who had been employed early in 1950 by the company when it purchased the sheet metal department of another concern. Beers is supposedly in Alaska and was not a witness at the trial. Nor was his deposition taken. However, Page Noll, the President of the company, in a deposition taken on December 8, 1951, stated his understanding of the arrangement with Naples in this manner:

"Mr. Beers had explained to me that on any work received from Goodrich there would be an engineering fee; that Mr. Keltner, Plant Engineer, Mr. Naples, the engineer directly under Mr. Keltner and one other person whose name I don't now recall, but who was active in plant engineering or plant maintenance, and Mr. Moon, the Purchasing Agent, had formed or were organized as an engineering group, and instead of having engineering work done outside or requesting suppliers or bidders on work to get their own engineers or engineering companies to do the work, that they, this Goodrich group, would do any engineering required on the job and that they would state *the exact fee* to be included in every bid for that engineering work. The explanation was that this was a method of *increasing the income of certain individuals employed by the Goodrich Company indirectly* without, as it was told to me, increasing the cost of the Goodrich Company." (Emphasis added.)

In his deposition he gave the details of the work listed on the invoice as C1782:

"Fabricate and install 16 gauge black iron guards for the drive unit of the water bag painter as per sketch 1/29/51 in your possession, guard to be rigidly secured to drive chain so that drop in hinge section is free swinging."

No matter what name is given to the services rendered by Naples in retro-

spect, it is quite evident that the work for which charges were made was work done by him *for the plaintiff* and not *for the contractors*. The statements made in 1951 by the contractors, to which we have referred, and those in the deposition from which a quotation has just been given clearly call them "kick-backs". Unconsciously perhaps, Mr. Noll gave them a correct legal characterization in these words:

"This was a method of increasing the income of certain individuals employed by the Goodrich Company indirectly."

In other words, it was a profit made by an employee *for work done for the employer*. There is a famous verse in Vergil in which the poet, in speaking of rumor, writes:

Viresque adquirit eundo. (It acquires strength as it goes).

The operation related by Naples and which the contractors tried to support at the trial seems to have a similar characteristic. It grows to gigantic size in the telling. In none of the early statements of Naples was any mention made of the tremendous amount of night work and work at home in engineering done on these jobs. Indeed, in the statement dated August 2, 1951, nothing is said about "the details" of the work done.

In a statement prepared September 11, 1951, which, according to the evidence in the record, Naples admitted summarized correctly the facts, but which he declined to sign, the transaction is described in the manner in which Mr. Noll and others described it,—namely, as an "engineering commission:"

"During the last five years of my employment with B. F. Goodrich Co. I was doing executive engineering work. By this I mean that I would conceive an idea for a job, draw up the specifications, including cost of production, and then submit the job for approval by the management. After approval I wrote up requisitions for the job and sent them to the purchasing department. The purchasing department then sent

out bids to various contractors who would come to the plant and I would then show them the jobs. The contractors would then make a verbal quotation or estimate to me. I then instructed them to add an engineering commission on the written bid inquiry which I was to get for my design and supervision of the job. The B. F. Goodrich Co. was then billed by the contractor for their estimate plus engineering commission. The contractor upon receiving payment from Goodrich would refund my commission to me in the name of Gregg or Lance Engineering Co's of which I was the sole member. Both company's were fictitious and were not licensed or registered."

The technic there described corresponds with what one gathers from the credible evidence in the case to be the fact. Naples' exactions were illegal demands exacted by him in violation of his trust as an employee. And no attempt to explain them as additional money earned, with or without the approval of the plaintiff, can, in the opinion of the court, overcome this bald fact, which fastens liability not only on Naples, but on those contractors who acted in concert with him to cause injury to the plaintiff.

### III

#### The Contemporaneous Statements and Admissions

In a case of this character, contemporaneous statements and declarations before the legal controversy arose have great significance in helping the trier of facts resolve conflicts of testimony. So it is very significant that, in his application to the State of California for registration as an engineer, dated February 11, 1949, in stating the work that he did for the Goodrich Company, he wrote:

"During the past five and a half years with the B. F. Goodrich Company as a mechanical design engineer, I have engineered and directed many projects of large expenditures. In 1944 the B. F. Goodrich Company relocated the tube curing department and installed all new equip-

ment which involved an expenditure of $350,000.00. From the beginning to the termination of this project, I was project engineer and had full responsibility of all designs, plans, drawings, specifications, reports, and installations of various miscellaneous heavy equipment and auxiliaries. Other projects which I assumed full engineering responsibility have been related to pumping systems, heating and ventilating designs and installations, machine shop practices, design of special machinery for labor saving or quality advantage. I prepare estimates and present a justification executive report for approval by top management. In these various assignments, I am also responsible for the field supervision of our own company craftsmen as well as outside contractors and engineers."

So these purchase orders and his own statement of the nature of the work indicate clearly that the type of engineering which he was performing was a part of his job for the plaintiff company. The absurdity of the claim that this engineering was done for the contractors is evidenced by several instances in which the contrast between the original bid and the added sum was so great that the contractor was at a loss to explain the nature of the engineering done. In one bill rendered by the Gregg Engineering Co. and paid by Economy Paint and Waterproofing Company, an unitemized bill included "sand blasting and other painting work". For this a $2,500 fee was charged, on a job for which a purchase order issued for $3,968 distinctly stated the manner in which the scaling area was to be treated before the paint was to be applied.

Gregg Engineering Co. had no "sandblasting" equipment to use for the benefit of this or any other contractor. The

claim is of a piece with others,—sheer fiction to cover illegal exactions.

Other bids were raised in similar amounts. A contract to Klingelberg for installing certain guards for conveyor belts for which the contractor bid $695.-00 was raised by Naples to $2,059.26, with instructions that the difference be paid to Gregg Engineering Company. On this contract, a discount of 10 per cent was allowed to the contractor. In the two voluntary statements prepared by this contractor and given to the Company, one dated August 8, 1951, and the other September 4, 1951, he states that the amounts were "kick-backs" which he paid to Naples under his direction.

This contractor and others did truly characterize the transactions as what they really were, and they cannot now avoid the full implications of their actions by referring to them euphemistically as nebulous engineering services which Naples performed. One contractor, who was a member of the partnership of Troy Sheet Metal Works, now dead, John M. Stewart, confided to his wife, who testified at the trial and by deposition, that he so resented these demands on the part of Naples that he determined not to do further business with the plaintiff company.

The surviving partner, who liquidated the partnership, denies knowledge of the transaction. But this does not relieve him of liability. Under California law, every partner is an agent of the partnership, for the purpose of its business, and the act of every partner for apparently carrying on the business of the partnership, including his wrongful acts, such as fraud and deceit, bind the partnership.[14]

IV

The Inadequacy of Present Explanations

It is one of the oddities of human character that by sheer process of telling

14. California Corporations Code, §§ 15009 (1), 15013. See, California Code of Civil Procedure, § 1870(5). See, Siebold v. Berdine, 1923, 61 Cal.App. 158, 162, 214 P. 655; Proctor v. Arakelian, 1929, 208 Cal. 82, 95–96, 280 P. 368; Gift v. Ahrnke, 1951, 107 Cal.App.2d 614, 622, 237 P.2d 706.

**354**

oneself or being told that a situation is other than it actually is, one comes to believe in the fiction rather than the fact. It may well be that these contractors, by continuously talking and thinking about these non-existing engineering fees, actually came to believe that they were paying for something. By sheer repetition since this controversy arose, they may have "conditioned" themselves into believing in the reality of the fictitious services. Some of these contractors did business with the plaintiff for many years, long before Naples was employed. They should have known that the scheme was a departure from fair and decent dealings. And even if it be assumed that when the contracts were let, these contractors actually believed that they were adding to the contract price the value of services to be rendered, the execution of the contracts should have demonstrated to them that no such services were being performed. At any rate, a trier of facts cannot accept such "conditioned" credulity as facts.

■ The amounts exacted by Naples were so out of proportion to the contract prices that Naples sought to defend them at the trial on the ground that they were justified by the savings to the Company. The legal answer is that Naples was an employee of the Company. And any benefits accruing to it by reason of any activity, either as a draftsman or engineer, in which he was the Company's agent must inure to its benefit, regardless of any question of "deceit".[15] If he felt that he was being underpaid for his services, he could not resort to this method of increasing his compensation.

■ Laying to one side the problem whether Keltner could bind the Company by a contract of this character which surrendered company profits to an employee,[16] I am convinced by a comparison of the two men, of their backgrounds, their conduct, and the manner in which they testified, that Mr. Keltner was truthful when he stated that he never agreed to or encouraged this type of transaction, and never knew that it was taking place until after he had left the

15. See cases cited in Note 8. An agent cannot (1) act in his own name, (2) define the scope of his agency, or (3) do any act which is forbidden to a trustee. California Civil Code, § 2322.

"All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover such benefits in an appropriate action. * * * In the absence of special circumstances, moneys received by one in the capacity of agent are not his, and the law implies a promise to pay them to the principal on demand. * * * It follows that the principal's right to recover *does not depend upon any deceit of the agent*, but is based upon the duties incident to the agency relationship and upon the fact that all profits resulting from that relationship belong to the principal." Savage v. Mayer, 1949, 33 Cal.2d 548, 551, 203 P. 2d 9, 10, (Emphasis added.)

And see, Troendle v. Clinch, 1932, 125 Cal.App. 147, 13 P.2d 852; Blandy v. Bowden, 1932, 217 Cal. 61, 16 P.2d 993; Brand v. Mantor, 1935, 6 Cal.App.2d 126, 44 P.2d 390. These cases tried by

the writer many years ago, while a Judge of the Superior Court of California, indicate that in all controversies of this type there is a pattern. Not only is the profit concealed, but the very agency is, at times, hidden behind an apparently different relationship. And the trier of facts must go behind the facade to find the true facts.

16. Howard v. Winton Co., 1926, 199 Cal. 374, 379, 249 P. 511, 512, 47 A.L.R. 1012:
"The rule that a general manager or superintendent may not, in the absence of express authority, contract to distribute to employees a portion of the profits of a business would appear to be dictated by sound business considerations. Were the rule otherwise, and should it be held that such power fell within the implied authority of a general manager or agent, it might be carried to unreasonable limits. And persons entering into contracts for a portion of the profits of a business should, for their own protection, make inquiry as to the actual authority of a general manager or agent in this respect. In the absence of such inquiry or of an estoppel or ratification, the principal should not be bound by the provisions of such a contract."

plant and was told by his successor of the discovery of Naples' activities. It is significant also that Naples' statement written in his own handwriting, and dated August 2, 1951, on what seems to be a ledger sheet, and witnessed by three of the Company's executives, made no claim whatsoever of authorization by Keltner or anyone else. Naples wrote:

"Purchase orders, engineering jobs requests and inquiries were discussed in detail as to origin, estimate, approval and final completion.

"*No other B. F. Goodrich employee has assisted or connected with any activity regarding these jobs and no money was ever paid to them by me.*" (Emphasis added.)

At the trial, Naples tried to explain this statement by saying that he merely meant that "no one else did any engineering". But the statement ending with the phrase "no money was ever paid to them by me", shows clearly that *Naples meant to absolve everyone connected with the Company of any knowledge of his activities.* Here again there is no consistency to Naples' tale. For at least one contractor testified at the trial that when he asked Naples how he was able to engage in this type of manipulation, Naples' answer was that he could not have done it unless some others on the inside were "in on it". On the witness stand, when the inconsistency was called to his attention, he denied having made the statement. However, the statement as written out by Naples warrants the inference that he intended to exculpate all others. This also is inferrable from the next two paragraphs in the statement which read:

"Gregg Engr. and Lance Engr. are accounts listed under my name as owner. Gregg Engr. was under George M. Gregg, a name I assumed for this purpose.

"*I fully intend to cooperate with the company on any matter that can be cleared up.*" (Emphasis added.)

If, as stated, he intended to cooperate with the Company, he would not have concealed the all-important fact, if *it had been a fact,* that the plant manager had sanctioned this conduct. It is natural that an employee should try to protect a fellow-employee. But it is inconceivable that a subaltern like Naples, who had been allowed to engage in activities of this type by the executive head of the plant, should have failed to exculpate himself by clearly and openly blaming the management. His failure to do so warrants the conclusion that there was no authorization for Naples' activities. This is aided by the fact that Naples, presumably,—as he stated in the last paragraph,—was desirous of cooperating with the Company on any matter that could be "cleared up."

Certainly the disclosure of a direct or even a tacit authorization by the manager of the plant,—a man who had spent his entire adult life after graduating from college in the employ of the Company,—and who had occupied important executive positions with it, ending with his promotion out of the plant in Los Angeles,—was, if it had been a fact, *imperative* in any effort to "clear up" the situation. It should be added that Edwin S. Park, the plant engineer who was his immediate superior, and the night watchman saw Naples but rarely at the plant after hours when he was supposed to have performed much of this engineering work for the contractors. And Park testified that as a part of his duties, and because the plant operated on a 24-hour shift, rarely did a day go by that he did not make at least one call at the plant after hours. Other contradictions could be referred to. But it is not intended to discuss in detail the testimony of all the witnesses in the case. The whole case turns about the verity of Naples' version of the transactions. The Court has already indicated that he is unworthy of credence. And we have referred to admissions and contradictory facts merely to show that the improbabilities inherent in the story itself are

such as to destroy entirely its evidentiary value.

■ It follows that the plaintiff is entitled to judgment against the defendants Henry Naples and Julia Naples in the sum of $52,728.70. Out of this total amount the plaintiff shall have judgment against the defendant contractors in the amounts designated opposite their names in the Order filed herewith.

## V

## Limitations on Liability

■ The judgment against Naples shall run jointly also against his wife. But this only to the extent that the plaintiff shall be able to pursue any community property which Julia Naples may have, including the sums derived from these transactions, wherever deposited. I am still of the view expressed at the trial that *Julia Naples is a proper, although not a necessary party.*[17] She should be retained in the case in order to enable the plaintiff to levy, *without legal complications,* on any community property standing in Julia Naples' name. There is no evidence that she participated in her husband's tort. The sudden affluence and the fact that at least $49,-122.67 went through joint accounts at banks and brokers are not sufficient to charge her with knowledge of her husband's perfidy towards the plaintiff.

■ The husband, under his power to manage the community property,[18] may bind it by acts which amount to fraud or deceit. To this extent, the rule of agency applies, which holds the principal through notice to the agent.[19] But the cases in which the wife was held personally liable were torts involving real property or interests in such property, in which the fraudulent representations of the husband were held binding on the wife because she had participated in consummating the transactions or retained real property secured in exchange.[20] This is not the situation here.

■ The fraud arose out of the relation of employer and employee between Naples and the Plaintiff. The wife's only interest in such relationship is the salary received by the husband, which is community property. That the amount must have been known to the wife, and that she had access to accounts which showed unusually large deposits, all out of proportion to the salary, does not, in my opinion, warrant charging her either with actual notice of the facts, or with notice of facts which she, in the exercise of what the California Civil Code calls "ordinary care and diligence"[21] could have discovered.

■ It should be added that, in view of the conclusions reached, "the covenant not to sue and covenant not to sue further" entered into on September 29, 1950, by the plaintiff and the defendant Harry M. Lukens and presented to the State Court, in which an action relating to the transactions here involved was then pending, does not release Naples for the remaining portion of the liability here found as to the Lukens transaction. Nor does the later dismissal of the entire action have that effect. He is re-

17. Grolemund v. Cafferata, 1941, 17 Cal. 2d 679, 111 P.2d 641.

18. California Civil Code, §§ 172, 172a.

19. California Civil Code, § 2332.

20. Hargrove v. Henderson, 1930, 108 Cal. App. 667, 683, 292 P. 148; *(representation as to boundaries of property);* Brown v. Oxtoby, 1941, 45 Cal.App.2d 702, 114 P.2d 622 *(fraud in loan on joint property solicited by wife);* Stegeman v. Vandeventer, 1943, 57 Cal.App.2d 753, 135 P.2d 186 *(conveyance of joint prop-* *erty as a part of fraudulent transaction);* Engle v. Farrell, 1946, 75 Cal. App.2d 612, 171 P.2d 588 *(fraudulent representation as to oil lands conveyed);* Macco Construction Co. v. Fickert, 1946, 76 Cal.App.2d 295, 172 P.2d 951 *(assignment of leases by husband and wife);* Palo Alto Bldg. Co., Inc. v. Jones, 1947, 81 Cal.App.2d 725, 185 P.2d 25 *(representation as to title of land held jointly).*

21. California Civil Code, § 2332.

leased *pro tanto* only by the amount paid by Lukens.[22] Nor does this covenant, under the facts found as to the relation of the other defendants to one another, affect their liability.[23]

---

**22.** See, Restatement: Torts, Sec. 885(2) and (3).

"It is unquestionably the law that the release of one of several joint tort-feasors operates as a release of all. Tompkins v. Clay Street R. R. Co. [1884], 66 Cal. 163, 4 P. 1165. *But the legal effect of a covenant not to sue is not the same as a release.*" Kincheloe v. Retail Cred-it Co., Inc., 1935, 4 Cal.2d 21, 23, 46 P. 2d 971, 972. (Emphasis added.)

And see, Lewis v. Johnson, 1939, 12 Cal. 2d 558, 562, 86 P.2d 99; Laurenzi v. Vranizan, 1945, 25 Cal.2d 806, 813, 155 P.2d 633; Pellett v. Sonotone Corp., 1945, 26 Cal.2d 705, 710, 160 P.2d 783, 160 A. L.R. 863.

**23.** See cases cited in Note 1.